# EXHIBIT 1

Aaron Shechet SBN 249002
Leigh Chandler SBN 253038
**CHANDLER & SHECHET, LLP**
P.O. Box 7244
Beverly Hills, CA 90212
Counsel@SolutionsLLP.com
Telephone: (310) 339-1354
Facsimile: (310) 558-1519

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

JUL 08 2016

Sherri R. Carter, Executive Officer/Clerk
By Cristina Grijalva, Deputy

Attorneys for Plaintiffs SCOTT HEGER and BLAIR ADHESIVE PRODUCTS, INC.

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES**

BC626433

| | |
|---|---|
| SCOTT HEGER, an individual; and BLAIR ADHESIVE PRODUCTS, INC., a California Corporation,<br><br>Plaintiffs<br><br>v.<br><br>KIKI TREE PICTURES, INC., a California Corporation;<br>WB STUDIO ENTERPRISES INC. a Delaware Corporation d/b/a WARNER BROS. PICTURES;<br>WARNER BROS. ENTERTAINMENT INC.;<br>TIM MOORE, an individual; and<br>DOES 1-50,<br><br>Defendants | Case No.:<br><br>**COMPLAINT FOR DECLARATORY RELIEF, QUANTUM MERUIT, BREACH OF ORAL CONTRACT, BREACH OF GOOD FAITH AND FAIR DEALING, FRAUD, AND LABOR CODE VIOLATIONS**<br><br>[*Jury Trial requested*]<br><br>By Fax |

Plaintiffs SCOTT HEGER and BLAIR ADHESIVE PRODUCTS, INC. complain of Defendants and allege:

**SUMMARY**

1. On January 15, 2009, US Airways Flight 1549, a commercial flight carrying over 150 passengers, suffered complete engine failure after striking a formation of birds.
2. The pilot, Captain Chesley B. Sullenberger, managed to land the unpowered aircraft in the Hudson River and every person on board survived. The incident was widely reported and has been referred to as "the Miracle on the Hudson."

3. This case arises from a film (referred to as "Sully") about this incident, which is directed by Clint Eastwood. Tom Hanks stars as Captain Sullenberger in Sully.
4. Due to the nature of Sully, there are two "main characters" of the film – Captain Sullenberger, and the Airbus A320 that he was flying during "the Miracle on the Hudson."
5. The principal responsibilities for accurately replicating the Airbus A320, and advising regarding Captain Sullenberger's interactions with the airplane in Sully, belonged to Plaintiff Scott Heger ("Scott").
6. Stated broadly, Scott was responsible for the "acting" of the inanimate "main character."
7. Despite Scott's contributions, which were central to the film, Defendants have refused to compensate him. Instead, they claim that he was already compensated by virtue of their payments to Plaintiff Blair Adhesive Products, Inc. ("Blair") for the purchase of the aircraft.

**PARTIES**

8. Plaintiff SCOTT HEGER is, and at all time relevant hereto was, an individual residing in California.
9. Plaintiff BLAIR ADHESIVE PRODUCTS, INC. is, and at all times relevant hereto was, a California Corporation, authorized to do business in California.
10. Defendant KIKI TREE PICTURES, INC. ("Kiki") is a California Corporation. Plaintiffs are informed and believe that Kiki maintains offices at the offices of WB Studio Enterprises, Inc. in Burbank, California.
11. Defendant WB STUDIO ENTERPRISES, INC. ("WB") is a Delaware Corporation that does business in California and maintains offices and studios in California. Plaintiffs are informed and believe that WB also uses the fictitious business name "Warner Bros. Pictures" and used such fictitious business name during the production of Sully
12. Defendant WARNER BROS. ENTERTAINMENT INC. ("WBE") is a Delaware Corporation that does business in California and maintains offices in California.

13. Defendant TIM MOORE ("Moore") is an individual. Plaintiffs are informed and believe that Moore is a Producer on Sully and at all times relevant hereto had the authority to act on behalf of Defendants, and each of them.

14. Plaintiffs do not know the true names and capacities of defendants sued fictitiously as Does 1 through 50. Plaintiffs will amend this Complaint to allege the true names and capacities of fictitiously named defendants when known to Plaintiffs. Each non-specific reference in this Complaint to "Defendant" or "Defendants" refers to all defendants, as well as those sued under such fictitious names.

15. Plaintiffs are informed and believe that each fictitiously named defendant is in some way liable to Plaintiffs, and each Defendant, including fictitiously named defendants, was the agent, servant, officer, employee, joint venturer, co-conspirator, representative, or partner of each of the other Defendants, and, in doing and taking part in the things and acts herein alleged, was acting within the course and scope of such authority and are therefore fully liable for the acts of the other Defendants.

16. Plaintiffs are informed and believe that Defendants Kiki and WB are actually the alter egos of each other and of Defendant WBE, because at all relevant times: (i) WBE dominated, influenced, and controlled WB, and the officers thereof, as well as the business, property, and affairs of WB, which in turn dominated, influenced, and controlled Kiki, and the officers thereof, as well as the business, property, and affairs of Kiki; (ii) there exists a unity of interest and ownership between WBE, Kiki, and WB such that the individuality and separateness of the three entities has ceased; (iii) Kiki is merely a shell of WB, which in turn is merely a shell of WBE, and WBE uses WB and Kiki as conduits to conduct its business, property, and affairs; (iv) Kiki and WB were organized by WBE as a device to avoid liability, to manipulate assets and liabilities between the entities, and for the purpose of substituting financially irresponsible entities in the place and stead of WBE, and so Kiki and WB were formed with capitalization totally inadequate for the business in which they are engaged; and (v) WBE, Kiki, and WB share offices, lawyers, and employees. By virtue of the foregoing, adherence to the fiction of the separate existence of WBE, Kiki, and WB

would, under the circumstances, sanction a fraud and promote injustice in that Plaintiffs would be unable to realize upon any judgment in their favor.

## JURISDICTION AND VENUE

17. This Court has jurisdiction to hear the subject matter of this complaint as Plaintiffs' claims arise under California law and are not pre-empted by Federal law, and the violations alleged herein occurred in substantial part in California. Venue is proper in this Court because all or some of the violations of law alleged herein occurred in the County of Los Angeles.

## GENERAL ALLEGATIONS

18. Plaintiffs are informed and believe that early in the pre-production of Sully, Defendants recognized that they would need to hire a consultant in order to make the airplane and pilot actions look realistic, and they would need to purchase actual aircraft for filming. On information and belief, the only member of the initial production crew with any piloting or aviation experience was Mr. Eastwood.

19. Scott is a pilot who started learning to fly airplanes at age 14. In addition to airplanes, Scott has been an active helicopter pilot for over 15 years. As an experienced pilot, he has the expertise necessary to advise regarding the correct look and function of a plane, the procedures a pilot would follow, and the small details necessary to make a movie about aviation and commercial aircraft look realistic. Scott is also the CEO of Blair.

20. Blair is, primarily, a manufacturer of industrial adhesives and products. It also obtains specialty and dangerous chemicals and various parts upon request for special effects, including aviation related items. Blair has been a supplier of liquid visual effects elements and specialty parts to the entertainment industry for more than 30 years. As such, the company is experienced in preparing and delivering materials efficiently within the schedule and budget of a motion picture, and was well suited to the task of finding, preparing, and delivering the airplanes for Sully.

21. The aviation business is highly structured and regulated by the FAA, whereas the film industry must make constant adaptations and compromises to achieve its goals within a limited period of time and budget. Accordingly, Scott, with his pilot experience, and Blair, with its entertainment experience, were a perfect combination to work on Sully.

22. On or around June 18, 2015, Steven Riley, the Special Effects Supervisor for Sully, introduced Scott to Moore. Moore was one of the Producers for Sully. Plaintiffs are informed and believe that Mr. Riley referred Scott to Moore because of Scott's experience as a pilot and Blair's history in the entertainment industry.

23. The introduction took place in a meeting at Moore's office at Malpaso Productions within the Warner Bros. Studio facility in Burbank, California. At the meeting, Moore asked if Scott could acquire airplanes for filming and also serve as "Aerial Coordinator" on the film.

24. Scott informed Moore that Blair had the resources to facilitate the purchase of the airplane construction for the set, while Scott had the expertise and ability to separately perform the function of Aerial Coordinator. Accordingly, Scott and Moore agreed that Scott would personally serve as Aerial Coordinator, and Blair would acquire the airplanes.

25. At the meeting, Moore acknowledged that the time commitment required to fulfill Scott's Aerial Coordinator responsibilities was unknown, but that the role would entail every detail surrounding the airplanes except for the actual procurement and transportation of the airplanes. Moore and Scott agreed that the Aerial Coordinator compensation would depend on the amount of work that was necessary, and that compensation would be based on the reasonable value of the services ultimately provided, so they would "revisit" the amount later. Moore also agreed to pay for Scott's travel, lodging, and other expenses related to Scott's work on Sully.

26. Regarding the acquisition of the airplanes, Blair entered into three written contracts with Kiki for the procuring, dismantling, transporting, reassembling, preparing and, at the end of filming, removing from the set two actual retired US AIRWAYS A-320 planes for Sully. These contracts are attached hereto as Exhibits A, B, and C, and are incorporated herein by reference (the "Procurement Contracts").

27. Blair fulfilled its obligations under the Procurement Contracts and, as agreed with Moore, Scott acted as Aerial Coordinator. Scott was listed as "Aerial Coordinator" on every crew list until the final list, which identified Scott as "Aerial Consultant." An example of one of these early crew lists, along with a later "crew call list," that both include Scott as "Aerial Coordinator," are incorporated herein by reference and attached hereto as Exhibit D.[1]

28. Because Scott was fully occupied with his Aerial Coordinator/Consultant work, Blair's work was supervised by Chad Heger, Scott's son and an employee of Blair. Chad remained on site every work day from the time the aircraft arrived until final film production was completed. Blair provided almost all of its own tools and employees to build the aircraft, and Chad oversaw every aspect of the process.

29. Scott's Aerial Coordinator/Consultant work was extensive and included, without limitation: consultation with respect to the interior look, exterior look, electronics, avionics, plane lighting, scouting, and location placement regarding the plane; script and aircraft changes to facilitate necessary dialogue; actor coaching with respect to pilot actions; review of footage for errors; coordination of aircraft related scenes; and advice regarding safety procedures.

30. Scott was asked to provide expertise related to flying so that the actors would be able to realistically interact with the plane's controls. Due to the nature of the film and Mr. Eastwood's style of filmmaking, the planning and pre-production phase was much longer than the actual filming. To take advantage of Georgia's film tax credit, Defendants filmed some of Sully outside of California and arranged for many airplane parts to go through and be invoiced to the State of Georgia although they were not used in Georgia. The vast majority of the work involving the airplanes was performed in California, and Scott was on the set of Sully during live filming at both Universal Studios and Warner Bros. Scott went to most of the group department head meetings, looked at footage regularly, and provided input, correcting actor errors and advising the film editor of mistakes. In addition, Scott

---

[1] The contact information of other individuals appearing in Exhibit D documents has been redacted for privacy reasons.

met one-on-one with Captain Sullenberger to ask questions on behalf of his department and several other departments. The answers to these questions were used to coach the actors and more accurately portray the events depicted in Sully.

31. During film production, Scott coordinated a very intricate special effects scene where four emergency life rafts and slides were deployed simultaneously and 150 actors and extras were required to evacuate into the water. Scott conducted a safety briefing during that morning for the entire crew, and remained within the aircraft, out of camera view, also serving as a safety supervisor inside the aircraft during the filming with a knife to cut the rafts should one of them malfunction and deploy internally. Scott oversaw the permitting process of a special flight waiver from the FAA, and permission from Universal Studios to perform low level helicopter operations within the set area.

32. After finishing at Universal Studios, Scott continued his work on Stage 19 at Warner Bros studios. He assisted in the placement and removal of aircraft windshields for filming at various angles and manipulation of various flight deck controls during filming. Scott also coached the main actors in flight deck and pilot procedures, hand movements, safety harness use, and control switch movements.

33. Scott devoted his full-time attention to Sully for over six months, often working sixty or more hours per week on Sully. All of Scott's work was performed as a result of the promise made by Moore, as agent of Defendants, that Scott would be compensated for it. None of this work was within the scope of the Procurement Contracts. Due to the time commitment required from Scott, Blair's CEO and primary sales person, Blair lost valuable business opportunities.

34. Moore reneged on his promises and representations with respect to Scott's compensation, and Defendants have repeatedly refused to compensate Scott for his services. Scott made numerous demands for payment. Despite the amount and type of work performed by Scott, the acknowledgement by Moore that Scott's work was separate from Blair's, and Defendants' inclusion of Scott on all crew lists as "Aerial Coordinator" or "Aerial Consultant," Defendants have claimed that Scott never performed services in that capacity

and all of Scott's work fell under the terms of the Procurement Contracts. An example of one of Scott's demands for payment is incorporated herein by reference and attached hereto as Exhibit E. On March 17, 2016, in response to Scott's final attempt to resolve this issue, Defendants' in-house counsel sent Scott a letter explaining Defendants' position that "no services from [Plaintiffs] other than those required under the Agreement were ever requested, agreed to or documented. This letter is incorporated herein by reference and attached hereto as Exhibit F.

35. On information and belief, Defendants have threatened to "blacklist" Blair and Scott should Scott take legal action to recover money owed to him.

36. On information and belief, Scott is the only full time member of the Sully crew who did not sign a "work made for hire" or other intellectual property agreement. Likewise, Blair did not sign a "work made for hire" or other intellectual property agreement. Neither Scott nor Blair have waived any intellectual property rights.

37. Scott was not asked to sign a written contract related to his Aerial Coordinator/Consultant work, but Defendants, by and through their agent Moore, asked Scott to perform that role and orally agreed to pay Scott the reasonable value of those services based on the amount and scope of services that Scott provided. At all times, Scott's performance of work was known to Defendants, at the request of Defendants, with the permission of Defendants, to the benefit of Defendants, and at no time did Defendants tell Scott to cease work or indicate that he would not be paid.

38. Blair was not asked to sign a written contract related to Scott's Aerial Coordinator/Consultant work, and that work was not referenced in any contract between Blair and Defendants.

39. It was understood by Scott and Defendants, and on information and belief the rest of the crew, that Scott's role was separate and distinct from Blair's role.

40. Defendants requested and accepted from Scott information, advice, expertise, and labor that was unrelated to Blair's services of procurement, assembly, and disposal of the airplanes. If Scott had not performed the Aerial Coordinator/Consultant work, Defendants would have

hired another Aerial Coordinator/Consultant to perform the identical work that Scott performed, and separately, Blair (or another party) would have still had to perform the work that Blair performed.

*Civil Conspiracy*

41. Defendants, and each of them, conspired with each other to obtain valuable services and creative contributions from Scott, individually or on behalf of Blair, without compensating Plaintiffs.

42. Defendants' conduct has caused and will continue to cause damage to Plaintiffs in an amount to be proved at trial, but which Plaintiffs believe is in excess of $250,000.

## <u>FIRST CAUSE OF ACTION: DECLARATORY RELIEF</u>

**(By Plaintiffs Scott Heger and Blair Adhesive Products, Inc. against all Defendants)**

43. Plaintiffs repeat and reallege the foregoing paragraphs as if fully set forth herein.

44. An actual controversy has arisen and now exists between Plaintiffs and Defendants concerning their respective rights and duties in that Plaintiffs contend that:

    a. the Aerial Coordinator/Consultant work was outside the scope of any written contract between Blair and any of the Defendants;

    b. the Aerial Coordinator/Consultant work was performed by Scott as an individual, and not by Blair; and

    c. Scott was working for Defendants as either an independent contractor or an employee of Defendants.

45. On information and belief, Defendants dispute these contentions and contend that:

    a. the Aerial Coordinator/Consultant work was within the scope of a written contract between Blair and one or more of the Defendants;

    b. the Aerial Coordinator/Consultant work was performed by Scott on behalf of Blair and not in his individual capacity; and

c. Scott was neither an employee nor an independent contractor working for Defendants.

46. Plaintiffs desire a judicial determination of the parties' rights and duties and a declaration as to the above disputed facts.

47. A judicial declaration is necessary and appropriate at this time under the circumstances in order that Plaintiffs may ascertain their rights, duties, and liabilities with respect to the Aerial Coordinator/Consultant work and compensation related to that work.

48. As a direct and proximate result of Defendants' actions, Plaintiffs have been damaged in an amount in excess of $250,000.

**SECOND CAUSE OF ACTION: QUANTUM MERUIT (SCOTT)**

**(By Plaintiff Scott Heger against all Defendants)**

49. Scott repeats and realleges paragraphs 1 - 42 as if fully set forth herein.

50. Defendants requested, by words and conduct, that Scott perform the Aerial Coordinator/Consultant work for the benefit of Defendants.

51. Scott performed the services as requested.

52. Defendants have not paid Scott or Blair for the services.

53. The services provided had a reasonable value of $250,000.

**THIRD CAUSE OF ACTION: QUANTUM MERUIT (BLAIR)**

**(By Plaintiff Blair Adhesive Products, Inc. against all Defendants)**

54. Blair repeats and realleges paragraphs 1 – 23, 26-38, and 40-42 as if fully set forth herein.

55. Defendants requested, by words and conduct, that Scott, an employee of Blair, perform the Aerial Coordinator/Consultant work for the benefit of Defendants.

56. Blair, through its employee Scott, performed the services as requested.

57. The work was outside the scope of the Procurement Contracts.

58. Defendants have not paid Scott or Blair for the services.

59. The services provided had a reasonable value of $250,000.

**FOURTH CAUSE OF ACTION: BREACH OF ORAL CONTRACT (SCOTT)**

**(By Plaintiff Scott Heger against all Defendants)**

60. Scott repeats and realleges paragraphs 1 - 42 as if fully set forth herein.

61. Scott and Defendants entered into an oral contract regarding the Aerial Coordinator/Consultant work.

62. Scott did all, or substantially all, of the significant things that the oral contract required him to do or was excused from having to do those things,

63. All conditions required for Defendants' performance occurred or were excused.

64. Defendants refused to compensate Scott as required by the terms of the contract.

65. Scott was harmed by Defendants' conduct in an amount to be proved at trial, but which Scott believes is in excess of $250,000.

**FIFTH CAUSE OF ACTION: BREACH OF ORAL CONTRACT (BLAIR)**

**(By Plaintiff Blair against all Defendants)**

66. Blair repeats and realleges paragraphs 1 – 23, 26-38, and 40-42 as if fully set forth herein.

67. Blair, through its CEO Scott, entered into an oral contract with Defendants regarding the Aerial Coordinator/Consultant work.

68. Blair, through its employee Scott, did all, or substantially all, of the significant things that the oral contract required him to do or was excused from having to do those things.

69. The Procurement Contracts did not supercede or integrate the oral contract.

70. All conditions required for Defendants' performance occurred or were excused.

71. Defendants have not paid Scott or Blair as required by the terms of the contract.

72. Blair was harmed by Defendants' conduct in an amount to be proved at trial, but which Blair believes is in excess of $250,000.

///

///

///

**SIXTH CAUSE OF ACTION: BREACH OF THE DUTY OF GOOD FAITH/FAIR DEALING**

**(By Plaintiff Blair Adhesive Products, Inc. against all Defendants)**

73. Blair repeats and realleges paragraphs 1 – 23, 26-38, and 40-42 as if fully set forth herein.
74. Blair and Defendants' entered into the Procurement Contracts.
75. Blair did all, or substantially all, of the significant things that the contract required it to do or was excused from having to do those things.
76. All conditions required for Defendants' performance occurred or were excused.
77. Defendants unfairly interfered with Blair's right to receive the benefits of the contract by requiring work beyond that specified in the Procurement Contracts and, thereafter, refusing to compensate Blair, or its employee Scott, for providing that work and by threatening to blacklist Blair and Scott in the entertainment industry if either sought to enforce their rights.
78. Blair was harmed by Defendants' conduct in an amount to be proved at trial, but which Blair believes is in excess of $250,000.

**SEVENTH CAUSE OF ACTION: FRAUD – INTENTIONAL MISREPRESENTATION**

**(By Plaintiff Scott Heger against all Defendants)**

79. Scott repeats and realleges paragraphs 1 - 42 as if fully set forth herein.
80. Defendants represented to Scott that Scott would be compensated for the Aerial Coordinator/Consultant work and that the compensation would be separate from Blair's compensation.
81. Defendants' representations were false.
82. Defendants knew that the representations were false when they made them.
83. Defendants intended that Scott rely on the representations.
84. Scott reasonably relied on Defendants' representations.
85. Scott was harmed in an amount to be proved at trial, but which Scott believes is in excess of $250,000.

86. Scott's reliance on Defendants' representation was a substantial factor in causing Scott's harm.

87. Defendants' conduct, in refusing to compensate Scott and in threatening to blacklist Scott and Blair in the entertainment industry if they took action to enforce their rights, was malicious, oppressive, and fraudulent. The conduct was despicable and intended to injure Plaintiffs. It was carried on with a willful and conscious disregard for Plaintiffs' rights, and included intentional misrepresentations and concealment of material facts with the intention of depriving Plaintiffs of their rights and property. Scott is thus entitled to an award of punitive damages against Defendants according to proof.

**<u>EIGHTH CAUSE OF ACTION: FRAUD – INTENTIONAL MISREPRESENTATION (BLAIR)</u>**

**(By Plaintiff Blair Adhesive Products, Inc. against all Defendants)**

88. Blair repeats and realleges paragraphs 1 – 23, 26-38, and 40-42 as if fully set forth herein.

89. Defendants represented to Blair that compensation for the Aerial Coordinator/Consultant work would be paid beyond the compensation paid for the Procurement Contracts.

90. Defendants' representation was false.

91. Defendants knew that the representation was false when it made the representation.

92. Defendants intended that Blair rely on the representation in accepting only the Procurement Contracts compensation, which did not include compensation for the Aerial Coordinator/Consultant work, and allowing its CEO Scott to work full-time for Defendants.

93. Blair reasonably relied on Defendants' representation.

94. Blair allowed its CEO Scott to devote over six months of his time to Sully because it reasonably believed there could be an ongoing business relationship between Blair and Defendants and that compensation would be paid for the Aerial Coordinator/Consultant work.

95. As a result of Defendants' breach, Blair was harmed in an amount to be proved at trial, but which Blair believes is in excess of $250,000.

96. Blair's reliance on Defendants' representation was a substantial factor in causing Blair's harm.

97. Defendants' conduct, in refusing to compensate Blair or Scott and in threatening to blacklist Blair and Scott in the entertainment industry if they took action to enforce their rights, was malicious, oppressive, and fraudulent. The conduct was despicable and intended to injure Plaintiffs. It was carried on with a willful and conscious disregard for Plaintiffs' rights, and included intentional misrepresentations and concealment of material facts with the intention of depriving Plaintiffs of their rights and property. Blair is thus entitled to an award of punitive damages against Defendants according to proof.

**NINTH CAUSE OF ACTION: LABOR CODE VIOLATIONS**

**(By Plaintiff Scott Heger against all Defendants except Tim Moore)**

98. Scott repeats and realleges paragraphs 1 - 42 as if fully set forth herein.

99. Scott performed Aerial Coordinator/Consultant work at the request of Defendants.

100. In performing the Aerial Coordinator/Consultant work, Scott was an employee of Defendants, except Tim Moore, but did not receive the compensation and benefits due to an employee.

101. Defendants did not pay Scott for that work.

102. Defendants often required Scott to work for periods of more than four hours without a rest period and more than six hours without a meal period.

103. Defendants did not provide timely and accurate itemized wage statements.

104. Defendants did not reimburse Scott for his necessary expenditures and losses incurred in direct consequence of the discharge of his duties.

105. Defendants owe Scott wages and overtime in an amount to be proven at trial, but which Scott believes to be in excess of $300,000 under the terms of the employment.

///

///

///

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

AS TO THE FIRST CAUSE OF ACTION:

1. General and special damages in amounts to be proven at trial, but in excess of $250,000;
2. For interest on the amounts owed to Plaintiffs by Defendants;
3. For the costs of the suit herein incurred;
4. For pre-judgment interest according to law;
5. A judicial determination of the parties' rights and duties and a declaration as to the disputed facts; and
6. For such other and further relief as this Court may deem just and proper.

AS TO THE SECOND, THIRD, FOURTH, AND FIFTH CAUSES OF ACTION:

1. General and special damages in amounts to be proven at trial, but in excess of $250,000;
2. For interest on the amounts owed to Plaintiffs by Defendants;
3. For the costs of the suit herein incurred;
4. For pre-judgment interest according to law; and
5. For such other and further relief as this Court may deem just and proper.

AS TO THE SIXTH, SEVENTH, AND EIGHTH CAUSES OF ACTION:

1. General and special damages in amounts to be proven at trial, but in excess of $250,000;
2. For interest on the amounts owed to Plaintiff by Defendant;
3. For the costs of the suit herein incurred;
4. For pre-judgment interest according to law;
5. For punitive damages; and
6. For such other and further relief as this Court may deem just and proper.

///

///

AS TO THE NINTH CAUSE OF ACTION:

7. General and special damages in amounts to be proven at trial, but in excess of $300,000;

8. For interest on the amounts owed to Plaintiff by Defendant;

9. For the costs of the suit herein incurred;

10. For pre-judgment interest according to law;

11. For attorney's fees as allowed by statute; and

12. For such other and further relief as this Court may deem just and proper.

Respectfully Submitted,

DATED: July 7, 2016

CHANDLER & SHECHET, LLP

By: ______________________

Aaron Shechet, Esq.
Attorneys for Plaintiffs SCOTT HEGER and BLAIR ADHESIVE PRODUCTS, INC.

**TABLE OF EXHIBITS**

| EXHIBIT | DESCRIPTION |
|---|---|
| **A** | Aircraft Parts Purchase and Sale Agreement with Waiver and Release of Liability (MSN #770) |
| **B** | Aircraft Parts Purchase and Sale Agreement with Waiver and Release of Liability (MSN #066) |
| **C** | Agreement for Airbus A320 Acquisition, Transport, Assembly, and Disposal |
| **D** | Crew list as of July 28, 2015 and "crew call" list of November 10, 2015 |
| **E** | Scott's January 6, 2016 demand for compensation |
| **F** | Defendants' March 17. 2016 letter rejecting Scott's demand for compensation |

# EXHIBIT A

# AIRCRAFT PARTS PURCHASE AND SALE AGREEMENT WITH WAIVER AND RELEASE OF LIABILITY

THIS AIRCRAFT SALE AGREEMENT (AGREEMENT) is made this 3rd day of September, 2015, between BLAIR ADHESIVE PRODUCTS INC, (Seller), and KIKI TREE PICTURES Inc.( Purchaser).
WITNESSETH:
That for and in consideration of the premises, and of the mutual promises, covenants, stipulations, and agreements hereinafter contained, and for and in consideration of three hundred fifty thousand Dollars ($350,000) paid by Purchaser to Seller, Seller and Purchaser have agreed, and by these presents, do agree as follows:
Seller agrees to sell to Purchaser a(n) Airbus A-320 aircraft, Federal Aviation Administration (FAA) registration number **N648AW**, AIRBUS Industries serial number **MSN # 770** an Air Transport class aircraft(the "Aircraft").

1.
Seller conveys Aircraft free and clear of all liens, claims, and encumbrances as are actually known to Seller. Purchaser acknowledges that Purchaser has conducted an aircraft title search or has had the opportunity to conduct an aircraft title search and is satisfied with the status of the title of Aircraft.

2.
Purchaser shall pay any and all taxes including, but not limited to, sales taxes and use taxes, duties, fees, or other obligations assessed or levied by any federal, state, or local authority as a result of the conveyance, sale, delivery, or registration. Labor for assembly, disassembly and transportation is extra cost.

3.
Purchaser acknowledges that this "set piece" was designed and constructed as an Standard Certificated Category aircraft and is not designed nor built to meet any standards of construction as a visual effects device. Further Purchaser understands that the new owner is free to make such modifications or changes as he, she, or it wishes. Such modifications **may render the aircraft completely valueless for resale**.
Purchaser acknowledges that the previous owner modified Aircraft prior to delivery and, as a result, may or may not contain structural and/or design defects or inadequate and/or inappropriate materials or components. This Agreement neither includes nor provides any assurances that Aircraft is complete, insurable, fit for service, or capable of being licensed or authorized for any use; or operational activities of any kind or nature whatsoever. Purchaser acknowledges and agrees that all decisions, judgments, or inspections related to the conveyance, sale, delivery, registration, or transfer of ownership of Aircraft are exclusively those of Purchaser and are Purchaser's sole and absolute responsibility.

4.
AIRCRAFT IS SOLD ON AN AS IS AND WITH ALL FAULTS BASIS FOR REASON THAT THE AIRCRAFT DOES NOT COMPLY WITH THE FEDERAL SAFETY REGULATIONS FOR STANDARD CERTIFICATED AIRCRAFT, SELLER DISCLAIMS ALL EXPRESSOR IMPLIED WARRANTIES OR REPRESENTATIONS OF ANY KIND OR NATURE WHATSOEVER TO PURCHASER AND ANYONE ELSE INCLUDING, BUT NOT LIMITED TO, WARRANTIES OR REPRESENTATIONS OF AIRWORTHINESS, MERCHANTABILITY, AND/OR FITNESS FOR PURPOSE, EXCEPT SELLER AGREES THAT AIRCRAFT WILL BE DELIVERED WITH AN APPROPRIATE BILL OF SALE IN THE STANDARD FAA FORM. FURTHER SELLER MAKES NO EXPRESS OR IMPLIED WARRANTIES OR REPRESENTATIONS OF ANY KIND OR NATURE WHATSOEVER THAT AIRCRAFT IS COMPLETE, AIRWORTHY, INSURABLE, FIT FOR SERVICE, OR CAPABLE OF BEING LICENSED OR AUTHORIZED FOR ANY FLIGHT, USE, OR OPERATIONAL ACTIVITIES OF ANY KIND OR NATURE WHATSOEVER. PURCHASER ACKNOWLEDGES AND AGREES THAT AS OWNER OF AIRCRAFT, PURCHASER SHALL BE RESPONSIBLE FOR ITS AERODYNAMICS AND STRUCTURAL CONCEPT AND FOR THE PERFORMANCE AND FITNESS FOR PURPOSE OF EVERY PART AND PIECE OF AIRCRAFT. ADDITIONALLY, SELLER DISCLAIMS ALL EXPRESS OR IMPLIED WARRANTIES OR REPRESENTATIONS OF ANY KIND OR NATURE WHATSOEVER TO PURCHASER AND ANYONE ELSE FOR ANY FLYING OR GROUND HANDLING CHARACTERISTIC, FOR THE STRUCTURAL INTEGRITY, OR FOR ANY FEATURE, PART OR COMPONENT OF AIRCRAFT.

5.
Seller has made Aircraft available to Purchaser at Purchaser's convenience without limitation, and has provided photographs of work being performed prior to the delivery of Aircraft to enable Purchaser to view progress of modification work being completed. Accordingly, Purchaser acknowledges that Purchaser is satisfied with the workmanship and condition of Aircraft and that it is suitable for Purchaser's own purposes. Seller will transfer to Purchaser, at the time of the delivery of Aircraft, such log books and other records, if any at all, pertaining to Aircraft which are in the possession of Seller.

6.
SELLER DISCLAIMS ALL EXPRESS OR IMPLIED WARRANTIES OF ANY KIND OR NATURE WHATSOEVER AS TO ANY LOG BOOKS OR OTHER RECORDS PERTAINING TO AIRCRAFT AND MAKES NO REPRESENTATIONS AS TO THE ACCURACY, COMPLETENESS, OR VERACITY OF ANY LOG BOOKS OR OTHER SUCH RECORDS PERTAINING TO AIRCRAFT.

7.
PURCHASER HEREBY WAIVES AND RELEASES BLAIR ADHESIVES FROM ANY AND ALL CLAIMS, LOSES, DEMANDS OR LIABILITY OF EVERY KIND WHICH SUCH PERSON OR PERSONS MAY HAVE, OR CLAIM TO HAVE, AGAINST SAID/ SELLER BY REASON OF ANY INJURY, DEATH OR PROPERTY DAMAGE OF ANY KIND SUSTAINED WHILE BEING AN OWNER, AN OPERATOR, OR A PASSENGER INTHIS AIRCRAFT. THIS WAIVER AND RELEASE IS BINDING ON THE HEIRS, PERSONAL REPRESENTATIVES AND ASSIGNS OF THE PURCHASER, SUBSEQUENT OWNER, AND PASSENGERS.

8.
Purchaser shall defend, indemnify, and hold Seller harmless from each and every claim made against Seller as a result of Purchaser's ownership, possession, use or operation of Aircraft/ SET PIECE from the date of this Agreement., except for a breach of SELLER's representation in Paragraph #1

9.
This Agreement shall be binding upon the agents, servants, employees, officers, directors, successors, assigns, heirs, next of kin, and personal representatives of both Seller and Purchaser.

10.
Purchaser agrees that by making any modification to the Aircraft, that standard weight and balance calculations obtainable from AIRBUS, may no longer apply. It is the responsibility of purchaser, or his agents to determine if the any components or accessories of Aircraft made will affect the structural integrity of the airframe

11.
Purchaser agrees to purchase and install promptly all necessary changes, modifications, alterations, or Improvements if required or necessary, and shall perform any other inspections, maintenance procedures, and repairs recommended or required or necessary.

12.
This Agreement shall be governed by and construed in accordance with the laws of the State of California.

13.
In any action brought to enforce or to interpret this Agreement, the Prevailing party shall be entitled to recover its costs and reasonable attorneys' fees including, without limitation, attorneys' fees incurred in connection with any appeal proceeding, and the sole and exclusive venue of any such action shall be in a court of appropriate jurisdiction for the County of Los Angeles, State of California, or in the United States District Court for the judicial district in which the County of Los Angeles, State of California, is or may be located.
Seller and Purchaser renounce and waives any right to have any such controversy litigated in any other place whether pursuant to the doctrine of forum non convenient or otherwise. Seller and Purchaser renounce and waive any right whatsoever to a trial by jury.

14.
This Agreement shall not be modified, revised, or amended except by an instrument in writing agreed to and Signed by both Seller and Purchaser.
If any part of this Agreement shall prove to be invalid or void, it shall in no manner affected or impair any of the remaining provisions of the Agreement which can be given effect without the invalid or void part.

15.
Purchaser is under no legal disability and has relied upon the advice and representation of an attorney of his own selection, or has had the opportunity to do so, prior to executing this Agreement. Further, Purchaser affirms that Purchaser has read and fully understands this Agreement, and has been fully advised as to the legal effects thereof or has had the opportunity to do so, prior to executing this Agreement.

16.
IN WITNESS WHEREOF, Seller and Purchaser have caused this Agreement to be executed on the day, month, and year first above written.

17.
All photography, motion pictures and sound recordings taken and/or made by Purchaser of or in connection with the Aircraft shall be vested solely in Purchaser.

18.
In no event shall SELLER be entitled to enjoin the production, distribution or exploitation of Purchaser's motion picture, currently entitled "SULLY"

Signed and sealed in the presence of:

____________________ DATE 9/4/15

PURCHASER

Tim Moore

Print Name

____________________

SELLER

____________________ DATE ____________________

Print Name:

____________________

# EXHIBIT B

# AIRCRAFT PARTS PURCHASE AND SALE AGREEMENT WITH WAIVER AND RELEASE OF LIABILITY

THIS AIRCRAFT SALE AGREEMENT (AGREEMENT) is made this 3rd day of September, 2015, between BLAIR ADHESIVE PRODUCTS INC, (Seller), and TIKI TREE PICTURES (Purchaser).

WITNESSETH:

That for and in consideration of the premises, and of the mutual promises, covenants, stipulations, and agreements hereinafter contained, and for and in consideration of two hundred thousand Dollars ($200,000) paid by Purchaser to Seller, Seller and Purchaser have agreed, and by these presents, do agree as follows: Seller agrees to sell to Purchaser a(n) Airbus A-320 aircraft, Federal Aviation Administration (FAA) registration number **N627AW**, AIRBUS Industries serial number **MSN # 066,** an Air Transport class aircraft(the "Aircraft").

1.

Seller conveys Aircraft free and clear of all liens, claims, and encumbrances as are actually known to Seller. Purchaser acknowledges that Purchaser has conducted an aircraft title search or has had the opportunity to conduct an aircraft title search and is satisfied with the status of the title of Aircraft.

2.

Purchaser shall pay any and all taxes including, but not limited to, sales taxes and use taxes, duties, fees, or other obligations assessed or levied by any federal, state, or local authority as a result of the conveyance, sale, delivery, or registration. Labor for assembly, disassembly and transportation is extra cost.

3.

Purchaser acknowledges that this "set piece" was designed and constructed as an Standard Certificated Category aircraft and is not designed nor built to meet any standards of construction as a visual effects device. Further Purchaser understands that the new owner is free to make such modifications or changes as he, she, or it wishes. Such modifications **may render the aircraft completely valueless for resale**.

Purchaser acknowledges that the previous owner modified Aircraft prior to delivery and, as a result, may or may not contain structural and/or design defects or inadequate and/or inappropriate materials or components. This Agreement neither includes nor provides any assurances that Aircraft is complete, insurable, fit for service, or capable of being licensed or authorized for any use; or operational activities of any kind or nature whatsoever. Purchaser acknowledges and agrees that all decisions, judgments, or inspections related to the conveyance, sale, delivery, registration, or transfer of ownership of Aircraft are exclusively those of Purchaser and are Purchaser's sole and absolute responsibility.

4.

AIRCRAFT IS SOLD ON AN AS IS AND WITH ALL FAULTS BASIS FOR REASON THAT THE AIRCRAFT DOES NOT COMPLY WITH THE FEDERAL SAFETY REGULATIONS FOR STANDARD CERTIFICATED AIRCRAFT, SELLER DISCLAIMS ALL EXPRESSOR IMPLIED WARRANTIES OR REPRESENTATIONS OF ANY KIND OR NATURE WHATSOEVER TO PURCHASER AND ANYONE ELSE INCLUDING, BUT NOT LIMITED TO, WARRANTIES OR REPRESENTATIONS OF AIRWORTHINESS, MERCHANTABILITY, AND/OR FITNESS FOR PURPOSE, EXCEPT SELLER AGREES THAT AIRCRAFT WILL BE DELIVERED WITH AN APPROPRIATE BILL OF SALE IN THE STANDARD FAA FORM. FURTHER SELLER MAKES NO EXPRESS OR IMPLIED WARRANTIES OR REPRESENTATIONS OF ANY KIND OR NATURE WHATSOEVER THAT AIRCRAFT IS COMPLETE, AIRWORTHY, INSURABLE, FIT FOR SERVICE, OR CAPABLE OF BEING LICENSED OR AUTHORIZED FOR ANY FLIGHT, USE, OR OPERATIONAL ACTIVITIES OF ANY KIND OR NATURE WHATSOEVER. PURCHASER ACKNOWLEDGES AND AGREES THAT AS OWNER OF AIRCRAFT, PURCHASER SHALL BE RESPONSIBLE FOR ITS AERODYNAMICS AND STRUCTURAL CONCEPT AND FOR THE PERFORMANCE AND FITNESS FOR PURPOSE OF EVERY PART AND PIECE OF AIRCRAFT. ADDITIONALLY, SELLER DISCLAIMS ALL EXPRESS OR IMPLIED WARRANTIES OR REPRESENTATIONS OF ANY KIND OR NATURE WHATSOEVER TO PURCHASER AND ANYONE ELSE FOR ANY FLYING OR GROUND HANDLING CHARACTERISTIC, FOR THE STRUCTURAL INTEGRITY, OR FOR ANY FEATURE, PART OR COMPONENT OF AIRCRAFT.

5.
Seller has made Aircraft available to Purchaser at Purchaser's convenience without limitation, and has provided photographs of work being performed prior to the delivery of Aircraft to enable Purchaser to view progress of modification work being completed. Accordingly, Purchaser acknowledges that Purchaser is satisfied with the workmanship and condition of Aircraft and that it is suitable for Purchaser's own purposes. Seller will transfer to Purchaser, at the time of the delivery of Aircraft, such log books and other records, if any at all, pertaining to Aircraft which are in the possession of Seller.

6.
SELLER DISCLAIMS ALL EXPRESS OR IMPLIED WARRANTIES OF ANY KIND OR NATURE WHATSOEVER AS TO ANY LOG BOOKS OR OTHER RECORDS PERTAINING TO AIRCRAFT AND MAKES NO REPRESENTATIONS AS TO THE ACCURACY, COMPLETENESS, OR VERACITY OF ANY LOG BOOKS OR OTHER SUCH RECORDS PERTAINING TO AIRCRAFT.

7.
PURCHASER HEREBY WAIVES AND RELEASES BLAIR ADHESIVES FROM ANY AND ALL CLAIMS, LOSES, DEMANDS OR LIABILITY OF EVERY KIND WHICH SUCH PERSON OR PERSONS MAY HAVE, OR CLAIM TO HAVE, AGAINST SAID/ SELLER BY REASON OF ANY INJURY, DEATH OR PROPERTY DAMAGE OF ANY KIND SUSTAINED WHILE BEING AN OWNER, AN OPERATOR, OR A PASSENGER INTHIS AIRCRAFT. THIS WAIVER AND RELEASE IS BINDING ON THE HEIRS, PERSONAL REPRESENTATIVES AND ASSIGNS OF THE PURCHASER, SUBSEQUENT OWNER, AND PASSENGERS.

8.
Purchaser shall defend, indemnify, and hold Seller harmless from each and every claim made against Seller as a result of Purchaser's ownership, possession, use or operation of Aircraft/ SET PIECE from the date of this Agreement., except for a breach of SELLER's representation in Paragraph #1

9.
This Agreement shall be binding upon the agents, servants, employees, officers, directors, successors, assigns, heirs, next of kin, and personal representatives of both Seller and Purchaser.

10.
Purchaser agrees that by making any modification to the Aircraft, that standard weight and balance calculations obtainable from AIRBUS, may no longer apply. It is the responsibility of purchaser, or his agents to determine if the any components or accessories of Aircraft made will affect the structural integrity of the airframe

11.
Purchaser agrees to purchase and install promptly all necessary changes, modifications, alterations, or Improvements if required or necessary, and shall perform any other inspections, maintenance procedures, and repairs recommended or required or necessary.

12.
This Agreement shall be governed by and construed in accordance with the laws of the State of California.

13.
In any action brought to enforce or to interpret this Agreement, the Prevailing party shall be entitled to recover its costs and reasonable attorneys' fees including, without limitation, attorneys' fees incurred in connection with any appeal proceeding, and the sole and exclusive venue of any such action shall be in a court of appropriate jurisdiction for the County of Los Angeles, State of California, or in the United States District Court for the judicial district in which the County of Los Angeles, State of California, is or may be located.
Seller and Purchaser renounce and waives any right to have any such controversy litigated in any other place whether pursuant to the doctrine of forum non convenient or otherwise. Seller and Purchaser renounce and waive any right whatsoever to a trial by jury.

14.

This Agreement shall not be modified, revised, or amended except by an instrument in writing agreed to and Signed by both Seller and Purchaser.

If any part of this Agreement shall prove to be invalid or void, it shall in no manner affected or impair any of the remaining provisions of the Agreement which can be given effect without the invalid or void part.

15.

Purchaser is under no legal disability and has relied upon the advice and representation of an attorney of his own selection, or has had the opportunity to do so, prior to executing this Agreement. Further, Purchaser affirms that Purchaser has read and fully understands this Agreement, and has been fully advised as to the legal effects thereof or has had the opportunity to do so, prior to executing this Agreement.

16.

IN WITNESS WHEREOF, Seller and Purchaser have caused this Agreement to be executed on the day, month, and year first above written.

17.

All photography, motion pictures and sound recordings taken and/or made by Purchaser of or in connection with the Aircraft shall be vested solely in Purchaser.

18.

In no event shall SELLER be entitled to enjoin the production, distribution or exploitation of Purchaser's motion picture, currently entitled "SULLY"

Signed and sealed in the presence of:

______________________ DATE 9/4/15

PURCHASER

Tim Moore

Print Name

______________________

SELLER

______________________ DATE______________________

Print Name:

______________________

# EXHIBIT C

blair adhesives
11034 Lockport Place Santa Fe Springs, CA 90670
562.946.6004 www.blairadhesives.com

# Airbus A320 Acquisition, Transport, Assembly, and Disposal

Prepared For:
"UNTITLED SULLY PROJECT"
KIKI TREE PICTURES Inc.
4000 Warner Blvd Building 81
Burbank, CA 91522

Prepared by:
Blair Adhesive Products, Inc.
11034 Lockport Place
Santa Fe Springs, CA 90670
562.946.6004
www.blairadhesives.com
Contact: Scott Heger,
scott@blairadhesives.com

Blair Adhesive Products, Inc. (hereinafter referred to as "BLAIR") is pleased to submit this agreement to KIKI TREE Pictures Inc. (hereinafter referred to as "KIKI TREE") for the procurement, disassembly, transport, reassembly, and disposal of multiple airframes and various components to multiple locations described in greater detail below.

By the signature of KIKI TREE authorized representative set forth below, KIKI TREE agrees to be bound by the representations made herein.

This document and the agreed pricing provided herein, shall remain valid for the length of this production. This is a "fixed price" agreement. Any changes require written agreement, via purchase order, between the parties involved.

Aircraft registration #s **N106CE** and **N206WB** have been reserved at this time.

blair adhesives
11034 Lockport Place Santa Fe Springs, CA 90670
562.946.6004 www.blairadhesives.com

I. Introduction

KIKI TREE needs to acquire multiple A320 airframes and components, to facilitate the production of "UNTITLED SULLY PROJECT", recounting the events of Captain Sullenberger on US Airways Flight 1549, in an incident that became known as "Miracle on the Hudson". A bird strike on takeoff caused both engines to fail, and a successful unpowered emergency landing was performed on the Hudson River, in which all 155 occupants survived and successfully evacuated. To facilitate the filming of reenacting these events, Falls Lake has been selected as one filming location, due to its appropriate size, facilities and availability. Falls Lake can accommodate a fully assembled Airbus A320-200, and when filled with water, should provide an ideal stand in location for filming (see fig. 1). This does present a logistical challenge of moving a visually complete large aircraft from its current out of state location, requiring disassembly, specialized transport and reassembly, referred to hereafter as "FULL A320 SET#1 ". To facilitate filming and decrease shooting days, a second airframe and interior will be transported to Falls Lake for interior aircraft shots (see fig. 2), and will be referred to hereafter as "A320 SET#2" , which includes a cut rear and front section including a flight deck.

To expand and restate KIKI TREE has provided a general specification and has communicated a set of requirements as follows:

1. Delivery and later removal of a visually complete exterior above wing level, FULL A320 SET #1(NO LANDING GEAR or ENGINES) in the vicinity of Falls Lake , Universal City, California
2. Delivery and later removal of a second A320 with wings and tail portion removed from the aircraft, also in the vicinity of Falls Lake used for concurrent shooting/ interior and flight deck shots
3. Delivery to Falls Lake and later removal of 1 center cut fuselage 3 seat wide section for shipping to New York City (on production company truck) for on location shots, if requested by production prior to fuselage cuts.

II. About Blair Adhesives

For over 30 years BLAIR has been in the business of adding that extra visual element to hundreds of feature films, televisions shows and commercials. It can safely be assumed that any blood, mud, oil, alien slime, and countless other liquid effects elements on film were created by BLAIR, from quantities ranging from 5 gallons to multiple tanker trucks. A recent example includes the more than 2,000 gallons of simulated mud for "American Sniper", as well as aircraft propellers and gearboxes for fan units. BLAIR has also been involved with supplying and brokering large scale visual elements used in "Flags of Our Fathers" including set dressing elements as well as pyrotechnic raw materials. Having worked with many Malpaso Productions features in the past, we understand the goals; short, efficient shooting schedules, and finishing production on time and on budget. BLAIR is committed to fast, effective solutions utilizing our proven team to deliver the required results as quickly, safely, and cost effectively as possible.

III. Scope of Work

To put it simply, this is a large logistical project involving that contains many thousands of individual figurative and literal moving parts. The overall goal of the project is to provide a realistic full sized visually complete set element that is as similar as reasonably possible to the Airbus A320-200 that operated flight 1549. BLAIR ADHESIVES will provide as noted:

1. Procure, disassemble, transport, reassemble, and dispose of 1 "visually complete" (minus landing gear and engine components or flight deck components) FULL A320 SET#1, delivered to Falls Lake at Universal Studios
   a. Procurement and Disassembly
      i. Aircraft is to be purchased by Blair Adhesives, and meticulously disassembled
      ii. Remove hazardous materials from aircraft
      iii. Remove or plug hydraulic systems that will be in contact with water
      iv. Drain and flush fuel tanks and remove lavatories (both airframes)
   b. Transport
      i. Provide all transport (approx. 6 truckloads, all oversized) including permitting and police escorts for oversized loads
         1. Note: 30 day lead time and 7 day travel window for CALTRANS permit
      ii. Arrange truck access and physical clearances for negotiating within Universal Studios
      iii. Coordinate crane/ truck unloading and provide equipment rentals for reassembly.
   c. Reassembly
      i. Provide and manage aircraft mechanics for reassembly with a 2 -3 week estimate.
      ii. Obtain and provide wiring diagrams for internal lighting/ systems
      iii. Build leg stands to match SPFX gimbal requirements to support completed aircraft (extra cost)

blair adhesives
11034 Lockport Place Santa Fe Springs, CA 90670
562.946.6004 www.blairadhesives.com

d. Weight and Balance
   i. Obtain weight and balance calculations from AIRBUS
   ii. Obtain airframe weight part estimates for trucking parts
   iii. Complete daily weight and balance estimates and ballast requirements on filming days
   iv. Obtain water ballast tanks to maintain weight equalization (dry calculations)
   v. Provide SPFX all necessary engineering information from AIRBUS

e. Disposal
   i. Provide labor to disassemble and properly recycle airframe –approx. 1 week
   ii. Provide transport for all disposal
   iii. Production company has the option of keeping aircraft, or any part thereof, except rental parts (namely cabin avionics, radome, and slats)

2. Procure, disassemble, transport, and dispose of 1 A320, minus wings and tail delivered to Falls Lake
   a. Obtain aircraft suitable for interior shots with full cabin, overhead bins, seats, galleys and doors to match above airframe
      i. This aircraft will have a flight deck with rented instrumentation in place. Best efforts will be made to be able to power on screens, switches and gauges and lights, though nothing will be truly functional. In other words, it will be good enough for incidental flight deck shots, but not flight accurate, and not all components are guaranteed to be functional.
   b. This aircraft will be cut to remove wings and tail for transportation purposes, and will only be intact from flight deck to rear doors (figure 3)
   c. Dispose of aircraft at the end of production
   d. Provide SPFX/ construction cutting instructions of sidewalls and roof

3. Procure, transport from Falls lake area, one A320 3 seat wide center fuselage piece for New York (if needed), and one piece of 7.5 foot wide fuselage section to Atlanta,Ga at Blair Adhesives expense.

IV. Timeline

| Day | |
|---|---|
| June 29 | Purchase and begin process to obtain clear titles to aircraft |
| August 3 | Aircraft titles transfer in process and final sales documents pending. Begin permitting process for transport. --10% Payment Due |
| August 3-29 | BLAIR start obtaining extra parts as needed |
| August 17 | Aircraft disassembly and prep continues –10% Payment Due |
| August 17 | Progress photos sent to production |
| August 24 | Progress photos sent to production |
| August 31 | Progress photos sent to production |
| Sept 1 | Fuselage section for NYC to be cut , and ready to go |
| Sept 3 | Fuselage in AZ and Victorville ready to go |
| Sept 7-14 | Aircraft arrives in approx. 9 trucks incl. special transport |
| Sept 8-25 (approx.) | Assembled FULL A320 #1 and A320 CUT #2 ready on parking lot adjacent to Falls Lake --80% final Payments Due. Payment per aircraft shall be paid at each completion promptly. |
| Last Film Day +2 Weeks | Disassembly, recycling, and proper disposal. |

V. General Terms and Conditions

1. BLAIR will require most if not all of the Falls Lake adjacent parking lot during the assembly period. (see figure 10)

2. BLAIR will not be responsible for any costs or schedule impacts associated with rectifying any issues or events beyond the reasonable control of BLAIR and its subcontractors, which prevent or otherwise inhibit completion of the project and do not fall within the general scope of work. The parties much agree in writing on the costs associated with any unplanned changes. Examples include but are in no way limited to cancellation of the production, change in production location, changes in production schedule, failure to obtain government required permits, etc.

blair adhesives
11034 Lockport Place Santa Fe Springs, CA 90670
562.946.6004 www.blairadhesives.com

3. Additional movement of aircraft components not covered in the Scope of Work can be arranged with BLAIR for an extra cost with an agreed upon written change order.

4. Flight deck components such as avionics, gauges and screens in the A320 UPPER component are considered rental parts that must be returned.

5. All components within A320 N106CE (SET#1) are unconditionally released to use as KIKI TREE sees fit, included but not limited to flooding with water, painting, general destruction on the FULL A320.

6. FULL A320 #1 does **not** include flight deck instrumentations, screens, avionics, engines components or landing gear.

7. Full U.S. Airways livery is mostly but not fully complete on current aircraft. It will require U.S Airways logo on the side of the aircraft, and tail. See figure 8 for more details. Painting not covered by BLAIR.

VI. Assumptions

1. All obligations of KIKI TREE described herein will be carried out in a timely manner, including the obligation to make timely payment in accordance with the payment terms and schedule provided herein.

2. Mutually acceptable terms and conditions will be negotiated between BLAIR and TIKI TREE and will supplement the terms and conditions contained herein

3. BLAIR will provide prompt feedback/ answers on any questions TIKI TREE may have and be reasonably available to respond

4. BLAIR employees, mechanics and crane equipment will be provided access to Universal lot/ Falls Lake as reasonably required to perform the work during the schedule set forth above. This also extends to BLAIR's subcontractors, and the substantial rental equipment used to reassembling the aircraft. During reassembly, production employees will only have limited escorted access to SET# 1 until completed.

VII. Definitions

1. **"Visually Complete"/ "SET #1 A320"** – Does not include engine outlet, flight deck components, emergency slides, life vest but does include cabin full interior
2. **"A320 SET #2" (**see Fig. 3)- An A320 that will not be placed in the water, and has a visually complete flight deck, galley, passenger compartment, doors. Does not include slides or life vest.
3. **Falls Lake –** Back lot filming location of Universal Studios
4. **SPFX-** The special effects department that will be moving, manipulating, and otherwise managing the aircraft after final inspection and reassembly
5. **Cockpit Avionics**—Any electrical component beyond the front passenger doors including the flight deck area

**OWNERSHIP**

Ownership, title and liability responsibility will pass to production Company, upon reassembly and acceptance. An FAA Bill of Sale and Titling if required will be competed at no additional cost to location of your choosing. Aircraft delivered to Georgia will Title in that State handled by Georgia aircraft dealer (no cost). The attached Liability release shall become part of this agreement for each airframe, no matter what State or business entity becomes the final SELLER of record. Since all production locations are yet to be determined, any additional cross-country movements of airframe parts to be at exact cost only, or by production company transportation. KIKI TREE has the option to keep intact SET #1 and SET #2, minus every flight deck component, KIKI TREE must give 30 days written notice prior to end of active production. If KIKI TREE keeps either or both airframes, this relieves BLAIR from the disposal, and labor to do so, including any time in the future. PRICE for all of the above work for both airframes, and center fuselage piece (if needed) is **$1,250,000.**

KIKI TREE PICTURES INC — 10/2/15 DATE — BLAIR ADHESIVES PRODUCTS INC

blair adhesives
11034 Lockport Place Santa Fe Springs, CA 90670
562.946.6004 www.blairadhesives.com

Figure 1:



Figure 2:




Figure 3:



blair adhesives
11034 Lockport Place Santa Fe Springs, CA 90670
562.946.6004 www.blairadhesives.com

Figure 8:



Figure 10:



# EXHIBIT D

**From:** **Lindsay Rodger** lindsay.production@gmail.com
**Subject:** Sully Project - Quick Reference List 7.28.15 WHITE
**Date:** July 28, 2015 at 7:45 PM
**To:** undisclosed-recipients:;
**Bcc:** scott@blairadhesives.com

Hello,

Attached please find the Quick Reference List for the "Untitled Sully Project" as of 7/28/15.

Please contact Production if you have any questions.

Best,

Lindsay

----
Lindsay Rodger
*Production Coordinator*
*"Untitled Sully Project"*
*Office: (818) 954-3367*

# UNTITLED SULLY PROJECT

QUICK REFERENCE LIST WHITE 7.28.15

**MALPASO**
4000 Warner Blvd.
Bldg. 81, Room 101
Burbank, CA 91522
818.954.3367 Office
818.954.4803 Fax

**PRODUCTION OFFICE**
TBA
TBA
Atlanta, GA
TBA
TBA

| NAME | POSITION | CELL | EMAIL |
|---|---|---|---|
| **Alana Weathers** | **Transpo Captain** | REDACTED | |
| Allyn Stewart | Producer | | |
| **Austin Elliott** | **Malpaso Office PA** | | |
| Blu Murray | Editor | | |
| **David M. Bernstein** | **1st Assist. Director** | | |
| Deborah Hopper | Costume Designer | | |
| **Eve Streger** | **Casting Associate** | | |
| Falesha Lo | 1st Asst. Accountant | | |
| **Frank Marshall** | **Producer** | | |
| Gary Fettis | Set Decorator | | |
| **Geoffrey Miclat** | **Casting Director** | | |
| Holly Hagy | Production Supervisor | | |
| **James J. Murakami** | **Production Designer** | | |
| Jessica Meier | Co-Producer | | |
| **Julien Pougnier** | **Sr. Lead Set Designer** | | |
| Kara Revel Jarzynski | Casting Assistant | | |
| **Kevin Ishioka** | **Art Director** | | |
| Kipp Nelson | Executive Producer | | |
| **Kristina Rivera** | **Co-Producer** | | |
| Larry Stelling | Transpo Coordinator | | |
| **Lindsay Rodger** | **Production Coordinator** | | |
| Megan Mieduch | Assistant to Mr. Moore | | |
| **Michael Owens** | **VFX Supervisor** | | |
| Mike Sexton | Property Master | | |
| **Mitch Kenney** | **Costume Supervisor** | | |
| Patrick Mignano | Location Manager | | |
| **Scott Heger** | **Aerial Coordinator** | | |
| Steven Riley | SPFX Supervisor | | |
| **Taffy Schweickhardt** | **Production Accountant** | | |
| [illegible] | [illegible] | | |

| | | |
|---|---|---|
| Tim Moore | Producer | |
| Tom Stern | Director of Photography | |

QUICK REFERENCE LIST

*Sully*
Kiki Tree Pictures Inc
4000 Warner Blvd. Bldg. 81 Rm. 110
Burbank, CA 91522
818.954.3367 (office)
818.954.4803 (fax)

Crew Call

# 8:00 AM

**TUESDAY, NOVEMBER 10, 2015**

Day: 30 of 37

CREW CALL: **8:00A**

# SULLY

**SHOOTING CALL: 8:30A**

SUNRISE: 6:22A
SUNSET: 4:53P
WEATHER: High 67F/Low 46
*Mainly sunny*

Director: Clint Eastwood
Producers: Clint Eastwood, Tim Moore, Frank Marshall, Allyn Stewart
Exec. Prod: Kipp Nelson
Co-Prod: Jessica Meier, Kristina Rivera
Writer: Todd Komarnicki

****** CLOSED SET - NO VISITORS ******

*** NO SMOKING & NO PERSONAL CAMERAS ALLOWED ON SET AT ANY TIME ***

| SET | SCENE | CAST | D/N | PGS | LOCATION |
|---|---|---|---|---|---|
| *TO COMPLETE:* | | | | | **UNIVERSAL STUDIOS FALLS LAKE** |
| **EXT. FRONT LEFT RAFT**<br>*Sully scans / silently counting.* | 112 | 1, 2, 10, 13, 16, 18, 19, 21 | D5 | 1/8 | CREW / EXTRAS PARKING<br>Universal Studios<br>CURIOUS GEORGE PARKING<br>1012 Universal Studios Blvd<br>(approximate address)<br>Universal City, CA 91608<br>PARK ON LEVEL B1 & ABOVE |
| **EXT. ATHENA FERRY / RAFT**<br>*Passengers / Barry are saved / Skiles climbs / Sully climbs.* | 113pt | 1, 2, 10, 13, 19 25, 26 | D5 | 4/8 | |
| *TO BEGIN TIME PERMITTING:* | | | | | |
| **EXT. PLANE- LEFT FRONT DOOR**<br>*The raft doesn't open / Barry jumps in.* | 82pt | 10, 11, 13 | D5 | 2/8 | BASECAMP/LOCATION<br>Universal Studios<br>BACKLOT – FALLS LAKE 100<br>Universal City Plaza<br>Universal City, CA 91608 |
| **EXT. PLANE / WATER**<br>*Barry surfaces / Starts swimming.* | 83 | 10, 13 | D5 | 2/8 | |
| **EXT. WATER**<br>*Barry stops swimming / Realizes he will not make it.* | 92pt | 13 | D5 | 1/8 | |
| | | | Total Pages | 1 2/8 | |

| # | CAST | CHARACTER | STATUS | PICK-UP | RPT/MU | SET | NOTES |
|---|---|---|---|---|---|---|---|
| 1 | FREDDIE CAIRO | SULLY | W | 6:30 A | 7:30 A | 9:00 A | CPU @ Home |
| 2 | AARON ECKHART | SKILES | W | - | 7:30 A | 9:00 A | |
| 10 | ANN CUSACK | DONNA DENT | W | - | 6:00 A | 8:30 A | Report to Curious George Structure |
| 11 | JANE GABBERT | SHEILA DAIL | W | 9:45 A | 10:00 A | 12:00 P | P/U @ HOTEL A |
| 12 | MOLLY HAGAN | DOREEN WELSH | H | - | - | - | |
| 13 | JEFFREY NORDLING | BARRY LEONARD- 1C | W | - | 6:30 A | 8:30 A | Report to Curious George Structure |
| 14 | VALERIE MAHAFFEY | DIANE HIGGINS- 17E | H | - | - | - | |
| 15 | DELPHI HARRINGTON | LUCILLE PALMER- 17F | H | - | - | - | |
| 16 | CHRISTOPHER CURRY | ROB KOLODJAY- 6C | W | - | 6:00 A | 8:30 A | Report to Curious George Structure |
| 18 | MAX ADLER | JIMMY STEFANIK- 6B | W | - | 6:00 A | 8:30 A | Report to Curious George Structure |
| 19 | COOPER THORNTON | JIM WHITAKER- 19F | W | - | 6:00 A | 8:30 A | Report to Curious George Structure |
| 20 | AUTUMN REESER | TESS SOSA- 19E | H | - | - | - | |
| 21 | MARCIA DeBONIS | SHAE CHILDERS- 13C | W | 6:15 A | 6:30 A | 8:30 A | P/U @ HOTEL A |
| 25 | GRANT ROBERTS | FRANCO SANTINI (ATHENA) | WF | - | 6:00 A | 8:30 A | Report to Curious George Structure |
| 26 | WAYNE BASTRUP | BRIAN KELLY (ATHENA) | WF | - | 6:00 A | 8:30 A | Report to Curious George Structure |
| 27 | GRAHAM SIBLEY | CARLO ALFONSO (MOIRA) | H | - | - | - | |
| 70 | VICTORIA KNARCHENKO | RUSSIAN WOMAN | WF | - | 7:00 A | 8:30 A | Report to Curious George Structure; HMU in Spartacus |
| 71 | SAYAT OZCAN | "I LOVEYOU" MAN | WF | - | 7:00 A | 8:30 A | Report to Curious George Structure; HMU in Spartacus |
| 100 | DOUG COLEMAN | STUNT COORDINATOR | W | - | 7:30 A | 8:30 A | Report to Curious George Structure |
| 101X | ALLEN ROBINSON | STUNT DOUBLE SULLY | W | 9:15 A | 9:30 A | 11:30 A | PU @ Sheraton Uni |
| 1AXX | MICKEY GIACOMAZZI | STUNT PASSENGER SEAT 1A | W | - | 6:30 A | 8:30 A | Report to Curious George Structure |
| 2AXX | PAUL E. SHORT | STUNT SEAT 2A MARK HOOD | W | - | 6:30 A | 8:30 A | Report to Curious George Structure |
| 2CXX | LISA KAY DEMPSEY | STUNT PASSENGER SEAT 2C | W | - | 6:30 A | 8:30 A | Report to Curious George Structure |
| 6EXX | CHASE COLEMAN | STUNT PASSENGER SEAT 6E | W | - | 6:30 A | 8:30 A | Report to Curious George Structure |
| 6FXX | MARK VANSELOW | STUNT PASSENGER SEAT 6F | W | - | 7:00 A | 8:30 A | Report to Curious George Structure |
| 7BXX | STEVE SCHRIVER | STUNT PASSENGER SEAT 7B JOE HART | W | - | 8:00 A | 9:30 A | Report to Curious George Structure |
| 17FXX | DONNA EVANS | STUNT DOUBLE LUCILLE 17F | W | - | 10:00 A | 11:30 A | Report to Curious George Structure |
| 23EXX | PETER EPSTEIN | STUNT PASSENGER SEAT 23E BILL Z. | W | - | 7:00 A | 8:30 A | Report to Curious George Structure |
| 25DXX | BRIAN MACHLEIT | STUNT PASSENGER SEAT 25D | W | - | 7:30 A | 8:30 A | Report to Curious George Structure |
| XX | MATT O'CONNOR | STUNT WATER SAFETY | W | - | - | 8:00 A | Report to Curious George Structure |
| XX | ALEX KRIMM | STUNT WATER SAFETY | W | - | - | 8:00 A | Report to Curious George Structure |

**STAND INS**

| # | | Rpt |
|---|---|---|
| 1 | SULLY SI (JON DONAHUE) | 8:00 A |
| 1 | UTILITY FEMALE SI | 8:00 A |
| 1 | UTILITY FEMALE SI | 8:00 A |
| 1 | UTILITY MALE (STEFFEN) SI | 8:00 A |
| 4 | Total Stand Ins | |

**BACKGROUND**

| # | | Rpt |
|---|---|---|
| 9 | FRONT LEFT RAFT (YELLOW) GROUP | 6:30 A |
| 20 | LEFT WING PASSENGERS (RED) GROUP | 6:30 A |
| 27 | LEFT WING PASSENGERS (RED) GROUP | 7:00 A |
| 56 | **Total BG** | |

**DEPARTMENTAL NOTES:**

***SPFX:*** Gimbal working, rafts inflated, rear water rig, boiler for heating hudson sprayers, ritters
***GRIP:*** Hydrascope crane
***LOCATIONS:*** AC capability
***STUNTS:*** Water safety
***ELECTRIC:***
***TRANSPO:***
***PROPS:*** life vests, Sully's logbook
***VEHICLES:***
***SET DRESSING:***
***COSTUMES:*** Prepared for wet work, Sully's overcoat
***ADDL. LABOR:***
***SPECIAL EQUIP:***
***MARINE:*** Water safety
***CAMERA:*** 3 cameras, Hydrascope crane
***ART DEPT.:***

EXTRAS PROCESSING:
Universal Studios
SPARTACUS SQUARE
100 Universal City Plaza
Universal City, CA 91608

**ALL CALLS SUBJECT TO CHANGE BY AD'S**
**NO FORCED CALLS, MEAL PENALTIES W/O PRIOR APPROVAL OF UPM. NO EXCEPTIONS.**

**** ADVANCE ****

| *WEDNESDAY, NOVEMBER 11, 2015* | SCENES | CAST | D/N | PGS | LOCATION |
|---|---|---|---|---|---|
| ***Projected Call Time: 8A*** | | | | | |
| **EXT. PLANE- LEFT FRONT DOOR**<br>*The raft doesn't open / Barry jumps in.* | 82pt | 10, 11, 13 | D5 | 2/8 | **UNIVERSAL STUDIOS FALLS LAKE** |
| **EXT. PLANE / WATER**<br>*Barry surfaces / Starts swimming.* | 83 | 10, 13 | D5 | 2/8 | |
| **EXT. WATER**<br>*Barry stops swimming / Realizes he will not make it.* | 92pt | 13 | D5 | 1/8 | |
| **EXT. PLANE- LEFT RAFT**<br>*They pull Barry into the raft / Give him a dry shirt.* | 99 | 2, 10, 19 | D5 | 1/8 | |
| **EXT. LEFT WING**<br>*Rob & Jimmy squeeze onto the wing / Rob thinks about going back in.* | 90 | 10, 16, 18, 19 | D5 | 5/8 | |
| | | | Total Pages | 1 1/8 | |

UPM: TIM MOORE
1st AD: DAVID BERNSTEIN
2nd AD: CLARK CREDLE 818.679.8608
2nd 2nd AD: PAULA CASE 818.203.8643

**Kiki Tree Pictures Inc.** CREW CALL: 8:00A TUESDAY, NOVEMBER 10, 2015

*• All crew with pre-calls must take an NDB — NO FORCED CALLS WITHOUT PRIOR APPROVAL OF PRODUCTION MANAGER •*

| | PRODUCTION | | RPT |
|---|---|---|---|
| 1 | DIRECTOR | CLINT EASTWOOD | 8:00 A |
| | | | |
| 1 | PRODUCER/UPM | TIM MOORE | 8:00 A |
| | | | |
| 1 | 1ST AD | DAVID BERNSTEIN | 8:00 A |
| 1 | KEY 2ND AD | CLARK CREDLE | 5:42 A |
| 1 | 2ND 2ND AD | PAULA CASE | 7:00 A |
| 1 | ADDL 2ND AD | AARON FITZGERALD | 6:00 A |
| | | | |
| 1 | DGA TRAINEE | NARBEH NAZARIAN | 5:42 A |
| | | | |
| 1 | SET PRODUCTION ASST. | CARLY OLSSON | 5:42 A |
| 1 | SET PRODUCTION ASST. | WHITNEY HODACK | 5:42 A |
| 1 | ADDL SET P.A. | JAMES CHESTNUT | 6:00 A |
| 1 | ADDL SET P.A. | ANTHONY STEINHARDT | 6:00 A |
| 1 | ADDL SET P.A. | AARON MOSKAL | 6:00 A |
| 1 | ADDL SET P.A. | 'CHARLIE MANCLARK | 5:42 A |
| | | | |
| | | | |
| | | | |
| 1 | PRODUCTION ASSOCIATE | CHUCK WEBB | 8:00 A |
| 1 | SCRIPT SUPERVISOR | SUSAN WATKINS | 8:00 A |
| | **CAMERA** | | **RPT** |
| 1 | DIRECTOR OF PHOTOGRAPHY | TOM STERN | 8:00 A |
| 1 | "A" CAMERA OP/STEADICAM | STEVE CAMPANELLI | 8:00 A |
| 1 | 1ST ASST "A" CAM | TONY RIVETTI | 7:30 A |
| 1 | 2ND ASST "A" CAM | ROGER WALL | 7:30 A |
| 1 | "B" CAMERA OP | ANDREW ROWLANDS | 8:00 A |
| 1 | 1ST ASST "B" CAM | JAMES APTED | 7:30 A |
| 1 | 2ND ASST "B" CAM | MAX DELEO | 7:30 A |
| 1 | "C" CAMERA OP | RICHARD MERRYMAN | 8:00 A |
| 1 | 1ST ASST "C" CAM | BRANDON PONTICELLE | 7:30 A |
| 1 | 2ND ASST "C" CAM | JARED JORDAN | 7:30 A |
| 1 | HYDRAFLEX HEAD TECH | LOREN ELKINS | 7:30 A |
| 1 | DIT | DANNY HERNANDEZ | 7:30 A |
| | | | |
| 1 | DATA WRANGLER | EDUARDO EGLIA | O/C |
| 1 | LOADER | NATHAN STERN | 7:30 A |
| 1 | CAMERA UTILITY | JAI CORRERA | 7:30 A |
| 1 | STILL PHOTOGRAPHER | KEITH BERNSTEIN | 8:00 A |
| | **SOUND** | | **RPT** |
| 1 | SOUND MIXER | JOSE GARCIA | 7:30 A |
| 1 | BOOM OPERATOR | JONATHAN FUH | 7:30 A |
| 1 | 2ND BOOM OPERATOR | GAIL CARROLL COE | 7:30 A |
| | **VIDEO** | | **RPT** |
| 1 | BTS CAMERA OPERATOR | LIZ RADLEY | 7:30 A |
| | | | |
| | **GRIP** | | **RPT** |
| 1 | KEY GRIP | CHARLES SALDANA | 7:30 A |
| 1 | BEST BOY GRIP | DOUG WALL | 7:30 A |
| 1 | "A" DOLLY GRIP | GREG BROOKS | 7:30 A |
| 1 | COMPANY GRIP | DOUG DOLE | 7:30 A |
| 1 | COMPANY GRIP | DONIS RHODEN | 7:30 A |
| 1 | COMPANY GRIP | MARK WOJCECHOWSKI | 7:30 A |
| 1 | COMPANY GRIP | MATT PERRY | 7:30 A |
| 1 | ADDL GRIP | CRAIG GARFIELD | 7:30 A |
| 1 | ADDL GRIP | JOE MACALUSO | 7:30 A |
| 1 | HYDRASCOPE TECH | STEVE MILLER | 7:30 A |
| 1 | HYDRASCOPE TECH | CHRISS DEFRANCO | 7:30 A |
| | **SET LIGHTING** | | **RPT** |
| 1 | GAFFER | ROSS DUNKERLEY | 8:00 A |
| 1 | BEST BOY ELECTRIC | JOHN LACY | 8:00 A |
| 1 | UNIVERSAL BB ELECTRIC | GLADE KNIGHT | 8:00 A |
| 1 | CONSOLE PROGRAMMER | TOMMY MARSHALL | 8:00 A |
| 1 | LAMP OP | BUZZY BURWELL | 8:00 A |
| 1 | LAMP OP | BRIAN MINZLAFF | 8:00 A |
| 1 | LAMP OP- LED FIXTURE TECH | SEAN ROBERTS | 8:00 A |
| | | | |
| | | | |
| | | | |
| 1 | RIGGING GAFFER | JASON FITZGERALD | O/C |
| 1 | RIGGING BEST BOY | JAMES FREDERICK | O/C |
| | **SPFX** | | **RPT** |
| 1 | SPFX COORD | STEVEN RILEY | O/C |
| 1 | SPFX COORD | MIKE EDMONSON | 7:00 A |
| 1 | SPFX FOREMAN | RYAN RILEY | 7:00 A |
| 1 | SPFX TECH | MARK BANICH | 7:00 A |
| 1 | SPFX TECH | NICK NICHOLSON | 7:00 A |
| | **VFX** | | **RPT** |
| 1 | VFX SUPERVISOR | MICHAEL OWENS | O/C |
| 1 | VFX DATA WRANGLER | SHYAM YADAV "TOAST" | O/C |
| 1 | VFX DATA WRANGLER | RON UNDERDAHL | 8:00 A |
| | **MARINE DEPT** | | **RPT** |
| 1 | MARINE COORD | JIMMY O'CONNELL | O/C |
| 1 | MARINE TECHS | RICK HICKS | O/C |
| 1 | MARINE TECHS | JAKE HICKS | O/C |
| 1 | MARINE TECHS | CHRIS PAPAJOHN | O/C |
| 1 | MARINE TECHS | KRIS JEFFRIES | O/C |

| | MAKE-UP | | RPT |
|---|---|---|---|
| 1 | MAKE-UP DEPT HEAD | LUISA ABEL | 5:42 A |
| 1 | KEY MAKE UP | KIM FELIX | 5:42 A |
| 1 | ADDL MAKE UP | CARRIE ANGLUND | 5:42 A |
| 1 | ADDL MAKE UP | ELENA ARROY | 6:12 A |
| 1 | ADDL MAKE UP | JAY WEJEBE | 6:12 A |
| 1 | ADDL MAKE UP | DAVID FORREST | 6:12 A |
| 1 | ADDL MAKE UP | NOREEN WILKE | 6:12 A |
| | | | |
| | **HAIR** | | **RPT** |
| 1 | HAIR DEPT HEAD | PATRICIA DEHANEY | 5:42 A |
| 1 | KEY HAIRSTYLIST | JOSE ZAMORA | 5:42 A |
| 1 | ADDL HAIRSTYLIST | CHERYL DANIELS | 5:42 A |
| 1 | ADDL HAIRSTYLIST | CAROLYN ELIAS | 6:12 A |
| 1 | ADDL HAIRSTYLIST | LUCIA MACE | 6:12 A |
| 1 | ADDL HAIRSTYLIST | NANCY TUNG | 6:12 A |
| 1 | ADDL HAIRSTYLIST | SUSAN SCHULER | 6:12 A |
| | **COSTUME** | | **RPT** |
| 1 | COSTUME DESIGNER | DEBORAH HOPPER | O/C |
| 1 | ASST. COSTUME DESIGNER | CAROLINE QUIROGA | O/C |
| 1 | COSTUME SUPERVISOR | MITCHELL KENNEY | O/C |
| 1 | KEY COSTUMER | SONNY MERRITT | O/C |
| 1 | SET COSTUMER | MATT JEROME | 5:42 A |
| 1 | SET COSTUMER | ANNIE CULOTTA | 5:42 A |
| 1 | SET COSTUMERS | NISA KELLNER | 5:42 A |
| 1 | SET COSTUMERS | AMY ARNOLD | 6:00 A |
| 1 | SET COSTUMER | VINCE PARADA | 6:00 A |
| 1 | SET COSTUMERS | ANDREW NELSON | 6:00 A |
| 1 | SET COSTUMER | VALERIE CAMPBELL | 6:00 A |
| 1 | SET COSTUMER | MYRON BAKER | 6:00 A |
| | | | |
| 1 | COSTUMES PA | INDRID ROSS | O/C |
| | | | |
| | | | |
| | | | |
| | **PROPERTY** | | **RPT** |
| 1 | PROP MASTER | MIKE SEXTON | 7:00 A |
| 1 | ASST. PROPMASTER | GREG GONZALES | 7:00 A |
| 1 | ASST. PROPS | JEFF ANGELO | 7:00 A |
| | | | |
| | | | |
| | | | |
| | **AERIAL** | | **RPT** |
| 1 | AERIAL COORD | SCOTT HEGER | O/C |
| | | | |
| | **ON-SET** | | **RPT** |
| 1 | ONSET DRESSER | MARCUS EPPS | 7:00 A |
| | | | |
| 1 | SCENIC | FRANCESCO FERRARA | 8:00 A |
| | **LOCATIONS** | | **RPT** |
| 1 | LOCATION MANAGER | PATRICK MIGNANO | O/C |
| 1 | ASST. LOC MANAGER | MIKE MASUMOTO | O/C |
| | | | |
| | **MISC.** | | **RPT** |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | **MEDICAL** | | **RPT** |
| 1 | MEDIC | LINDA STELLING | 7:30 A |
| 1 | MEDIC | ALEX GARCIA | 6:00 A |
| | **CRAFT SERVICE** | | **RPT** |
| 1 | CRAFT SERVICE | NANCY JAMES | 5:30 A |
| 1 | CRAFT SERVICE | GLENN CASTALAZZO | 5:30 A |
| 1 | CRAFT SERVICE | JOE FORTE | 5:30 A |
| 1 | CRAFT SERVICE | LOUIS MORENO | 5:30 A |
| | | | |
| | **PUBLICITY** | | **RPT** |
| 1 | UNIT PUBLICIST | FRANCES FIORE 917.607.5790 | |
| | **CATERING** | | **RPT** |
| 1 | Crew Bfasts 200 | TONY KERUM | 5:42A |
| 1 | BG Bfasts 60 | HIRO | 6:00A |
| | Total Crew Lunches: 200 | | 2:00P |
| | Total BG Lunches : 60 | | 2:00P |
| | **TRANSPORTATION** | | **RPT** |
| 1 | TRANSPO COORD | LARRY STELLING | O/C |
| 1 | TRANSPO CAPTAIN | ALANA WEATHERS | O/C |
| 1 | TRANSPO CO- CAPTAIN | DOM RODRIGUEZ | O/C |
| | **SAFETY NOTES** | | |
| | SAFETY BULLETINS ATTACHED: | 5, 41 | |
| | ANONYMOUS SAFETY HOTLINE: | 877.566.8001 | |
| | KENNY HURAVE CONTACT: | 818.954.1227 | |
| | [illegible] | 3E 800.451.8346 | |
| | ADDL SAFETY INFO AVAILABLE AT: | [illegible] | |
| | NEAREST HOSPITAL: | | |
| | ST. JOSEPH'S HOSPITAL | 818.843.5111 | |
| | 501 S. Buena Vista St. | Burbank, CA 91505 | |
| | **WALKIES CHANNELS** | | |
| | 1-AD's, 2-AD's(Private), 3-Transpo, 4-AD's (Private), 5 - Props, 6- Camera | | |
| | 7- Electrical, 8- Grips, 9- Stunts, 10- OPEN, 11- SPFX, | | |
| | 12- Marine, 13-VFX, 14- open, 15- open 16- Rigging Grips | | |

**** ADVANCE CONTINUED ****

| THURSDAY, NOVEMBER 12, 2015 | SCENES | CAST | D/N | PGS | LOCATION |
|---|---|---|---|---|---|
| *Projected Call Time: 8A* | | | | | |
| **EXT. LEFT WING** *Shae exits the plane / jumps in the water.* | 96 | 10, 13, 16, 18, 19, 21 | D5 | 1/8 | [illegible] |
| **EXT. LEFT WING / WATER** *Passengers shout at Shae / She's drowning.* | 100 | 10, 13, 16, 18, 19, 21 | D5 | 2/8 | |
| **EXT. MOIRA SMITH** *Shae bobs in the water / Moira Smith arrives / Spins toward front* | 102pt | 10, 13, 16, 18, 21, 27 | D5 | 2/8 | |
| **EXT. WATER** *Shae is drowning.* | 104pt | 21 | D5 | 1/8 | |
| **EXT. MOIRA SMITH** *Shae catches the Jacob's cradle / Alfonso tries to pull her up.* | 105pt | 21, 27 | D5 | 5/8 | |
| **EXT. WATER / MOIRA SMITH** *Delaney & Rodriguez swim to rescue Shae / Rescue her.* | 107pt | 21, 22, 23 | D5 | 4/8 | |
| *COMPANY MOVE TO NY STREET* | | | | | |
| **EXT. MANHATTAN STREET** *The plane careens down the city street / Explodes.* | 9pt | Stunts, BG | D5 | 2/8 | NY STREET |
| | | | Total Pages | 1 7/8 | |

# EXHIBIT E

Jan 6, 2016

Tim Moore

Malpaso Productions

4000 Warner Blvd, Bldg 81

Burbank ,Ca 91522

Tim,

I want to let you know in writing how disappointed I am that you have chosen not to pay me any employee wages for my input and hard work on the Sully project. Despite having meetings in both October and December requesting wage payment, it is apparent that your final position was not to pay anything.

My work as "Aerial Coordinator" was separate from the work BLAIR contracted for. I spent 60+ hours a week on set, going to meetings, contributing ideas, answering emails, scouting, planning, writing reports, and overseeing my area of responsibilities within production budget and timelines. That was not BLAIR's work, that was mine, and I did it all without a contract because you told me that I would be paid for it.

I hope "SULLY" will be a great commercial success for you, and am very proud of what I was able to contribute towards that goal.

Scott

SCOTT HEGER

# EXHIBIT F

Warner Bros. Pictures

Sandra K. Smokler
Senior Vice President
and Deputy General Counsel

March 17, 2016

**VIA ELECTRONIC MAIL**
**scott@blairadhesives.com**

Scott Heger
Blair Adhesive Products, Inc.
11034 Lockport Place
Santa Fe Springs, CA 90670

RE: "SULLY" (the "Picture")

Dear Mr. Heger:

Your March 11th correspondence to Jessica Meier and others has been referred to me for response.

We will not point out all of the inaccuracies throughout your letter. Suffice it to say, we disagree with the suggestion that your involvement with the Picture was anything other than as set forth in the fully-executed agreement ("Agreement") between your company, Blair Adhesive Products, Inc. ("Blair") and Kiki Tree Pictures.

Under the Agreement, Blair contracted to provide certain static airframes for use as set pieces during 10 shooting days in Los Angeles, including, but not limited to, transport, disassembly and reassembly at the shooting location, maintenance of daily weight and balance requirements during filming and disposal. In consideration of such services, Blair was paid in excess of $1,700,000 based on bids submitted by you.

The only comments from Tim Moore about the possibility of hiring you in an individual capacity as aerial coordinator were made when the production was considering California as the principal location. However, two months before the commencement of principal photography, it was determined the production would not receive the California film incentive. As a result, the majority of principal photography

(including all aerial photography) moved to locations where you were not engaged, including Georgia, New York, North Carolina and New Mexico. The scenes remaining to be shot in California were scheduled for the end of photography and involved the static airframes Blair contracted to provide under the Agreement.

In short, no services from you other than those required under the Agreement were ever requested, agreed to or documented.

None of the foregoing is intended, nor shall it be construed, as a complete statement of the rights and remedies of Warner Bros. or Malpaso Productions, all of which are expressly reserved.

Very truly yours,

Sandra K. Smokler

SKS/tg

cc: Jessica Meier
Tim Moore
Frank Marshall
Kipp Nelson
Allyn Stewart



4000 Warner Boulevard, Burbank, California 91522
(818) 954-2909 ·Fax: (818) 954-3274 ·sandra.smokler@warnerbros.com