# EXHIBIT 20

KELLEY DRYE & WARREN LLP
Michael J. O'Connor (State Bar No. 090017)
David E. Jang (State Bar No. 258914)
10100 Santa Monica Boulevard
23rd Floor
Los Angeles, CA 90067-4008
Telephone: (310) 712-6100
Facsimile: (310) 712-6199
moconnor@kelleydrye.com
djang@kelleydrye.com

Attorneys for Defendants KIKI TREE PICTURES, INC., WB STUDIO ENTERPRISES INC. d/b/a WARNER BROS. PICTURES, WARNER BROS. ENTERTAINMENT INC. and TIM MOORE

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

SEP 30 2016

Sherri R. Carter, Executive Officer/Clerk
By Shaunya Bolden, Deputy

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES**

SCOTT HEGER, an individual; and BLAIR ADHESIVE PRODUCTS, INC., a California Corporation,

Plaintiffs,

v.

KIKI TREE PICTURES, INC., a California Corporation; WB STUDIO ENTERPRISES INC., a Delaware Corporation d/b/a WARNER BROS. PICTURES; WARNER BROS. ENTERTAINMENT INC.; TIM MOORE, an individual; and DOES 1-50,

Defendants.

KIKI TREE PICTURES, INC., a California Corporation,

Cross-Complainant,

v.

SCOTT HEGER, an individual; and BLAIR ADHESIVE PRODUCTS, INC., a California Corporation,

Cross-Defendants.

CASE NO. BC626433

**DEFENDANTS' ANSWER TO PLAINTIFFS' UNVERIFIED COMPLAINT AND CROSS-COMPLAINT OF KIKI TREE PICTURES, INC.**

**<u>JURY TRIAL DEMANDED</u>**

(Assigned to Hon. Richard E. Rico, Dept. 17)

Action Filed: July 8, 2016
Trial Date: None Set

Defendant and Cross-Complainant Kiki Tree Pictures, Inc. ("Kiki" or "Cross-Complainant") and Defendants WB Studio Enterprises Inc. d/b/a Warner Bros. Pictures ("WB"), Warner Bros. Entertainment Inc. ("WBE") and Tim Moore (collectively with Kiki, "Defendants") hereby answer the unverified Complaint of Plaintiffs Scott Heger and Blair Adhesive Products, Inc. (collectively, "Plaintiffs" or "Cross-Defendants").

## GENERAL DENIAL

Pursuant to Section 431.30(d) of the California Code of Civil Procedure, Defendants deny, both generally and specifically, each and every allegation contained in the Complaint, together with each and every cause of action alleged therein. Defendants further specifically deny that Plaintiffs have been damaged by Defendants in the sum alleged, or in any sum whatsoever, or at all. Defendants further specifically deny that Plaintiffs are entitled to the relief sought within the Complaint or to any other form of relief whatsoever against Defendants.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

### (Failure to State a Claim)

1. The Complaint, and each cause of action and claim for relief alleged therein, fails to allege sufficient facts upon which any claim for relief against Defendants can be granted.

### SECOND AFFIRMATIVE DEFENSE

### (No Oral Contract)

2. The Complaint, and each cause of action and claim for relief alleged therein, is barred, in whole or in part, on the ground that the parties did not enter into an enforceable oral contract.

### THIRD AFFIRMATIVE DEFENSE

### (Excuse of Performance)

3. Without admitting the existence of any oral agreement between Defendants and Plaintiffs, the Complaint, and each cause of action and claim for relief alleged therein, is barred because Defendants are excused from any and all obligations under the oral agreement alleged in the Complaint.

**FOURTH AFFIRMATIVE DEFENSE**

**(Full Performance of Obligations)**

4. Without conceding the existence of the alleged oral agreement, the Complaint, and the causes of action and claims for relief alleged therein, is barred in whole or in part because Defendants have duly performed, satisfied and discharged all duties and obligations, if any, it may have owed Plaintiffs.

**FIFTH AFFIRMATIVE DEFENSE**

**(Breach of Contract)**

5. The Complaint, and each cause of action and claim for relief alleged therein, is barred, in whole or in part, by Plaintiffs' breach of contract.

**SIXTH AFFIRMATIVE DEFENSE**

**(Breach of Implied Covenant of Good Faith and Fair Dealing)**

6. Without conceding the existence of the alleged oral agreement, the Complaint, and each cause of action and claim for relief alleged therein, is barred, in whole or in part, by Plaintiffs' breach of the implied covenant of good faith and fair dealing of the alleged oral agreement and the parties' written agreement.

**SEVENTH AFFIRMATIVE DEFENSE**

**(Unclean Hands)**

7. The Complaint, and each cause of action and claim for relief alleged therein, is barred, in whole or in part, by the doctrine of unclean hands.

**EIGHTH AFFIRMATIVE DEFENSE**

**(No Claim for Quantum Meruit)**

8. Plaintiffs' cause of action for quantum meruit is barred, in whole or in part, by the alleged existence of an express oral contract, as well as the existence of written agreement between the parties.

**NINTH AFFIRMATIVE DEFENSE**

**(Waiver)**

9. As a result of the acts, conduct and/or omissions of Plaintiffs, Plaintiffs have

waived any purported cause of action they may have against Defendants.

**TENTH AFFIRMATIVE DEFENSE**

**(Estoppel)**

10. As a result of the acts, conduct and/or omissions of Plaintiffs, Plaintiffs are estopped from pursuing any purported cause of action they may have against Defendants.

**ELEVENTH AFFIRMATIVE DEFENSE**

**(Indefinite Terms)**

11. The Complaint, and each cause of action and claim for relief alleged therein, is barred, in whole or in part, because the material terms of the alleged oral agreement are indefinite.

**TWELFTH AFFIRMATIVE DEFENSE**

**(Accord and Satisfaction)**

12. Without conceding the existence of any unfulfilled obligations by Defendants to Plaintiffs, the Complaint, and each cause of action and claim for relief alleged therein, is barred, in whole or in part, by Plaintiffs' acceptance of valuable consideration in full satisfaction and discharge of Defendants' obligations to Plaintiffs.

**THIRTEENTH AFFIRMATIVE DEFENSE**

**(Offset, Setoff and Recoupment)**

13. Without conceding that any act of Defendants caused damage to Plaintiffs in any respect, Defendants are entitled to offset, setoff and/or recoup against any judgment that may be entered for Plaintiffs, all obligations of Plaintiffs owing to Defendants and/or any amount that Plaintiffs allege is outstanding that Defendants have already paid (or overpaid) to Plaintiffs.

**FOURTEENTH AFFIRMATIVE DEFENSE**

**(Express Covenant Inconsistent with Implied Covenant)**

14. The Complaint, and each cause of action and claim for relief alleged therein, is barred, in whole or in part, to the extent the Complaint relies on a purported implied covenant that is inconsistent with an express covenant in the agreement between the parties.

///

///

**FIFTEENTH AFFIRMATIVE DEFENSE**

**(Lack of Damages)**

15. Plaintiffs have not sustained any cognizable damages from any act or omission attributable to Defendants, and, therefore, have no claim upon which relief may be granted as against Defendants.

**SIXTEENTH AFFIRMATIVE DEFENSE**

**(Failure to Allege Non-Contract Damages)**

16. Plaintiffs' tort claims are barred, in whole or in part, on the ground that they fail to allege damages independent of a breach of contract claim and are thus barred by the economic-loss rule.

**SEVENTEENTH AFFIRMATIVE DEFENSE**

**(Failure to Mitigate Damages)**

17. The Complaint, and each cause of action and claim for relief alleged therein, is barred, in whole or in part, by Plaintiffs' failure to mitigate, reduce, or otherwise avoid any damages.

**EIGHTEENTH AFFIRMATIVE DEFENSE**

**(Lack of Reasonable Reliance)**

18. The Complaint, and each cause of action and claim for relief alleged therein, is barred, in whole or in part, by Plaintiffs' unreasonable reliance on any alleged misrepresentations by Defendants.

**NINETEENTH AFFIRMATIVE DEFENSE**

**(Absence of Material Factual Misrepresentation)**

19. The Complaint, and each cause of action and claim for relief alleged therein, is barred, in whole or in part, on the ground that Plaintiffs have failed to allege, with the requisite specificity, that Defendants made a material factual misrepresentation.

**TWENTIETH AFFIRMATIVE DEFENSE**

**(Unjust Enrichment)**

20. The Complaint, and each cause of action and claim for relief alleged therein, is

barred, in whole or in part, because under the circumstances presented, any recovery by Plaintiffs from Defendants would constitute unjust enrichment.

**TWENTY-FIRST AFFIRMATIVE DEFENSE**

**(Acts or Omissions of Plaintiffs)**

21. The Complaint, and each cause of action and claim for relief alleged therein, is barred because any alleged damages purportedly sustained by Plaintiffs, if any, were wholly caused by the acts or omissions of Plaintiffs.

**TWENTY-SECOND AFFIRMATIVE DEFENSE**

**(No Conduct Warranting Punitive Damages)**

22. Defendants cannot be held liable for punitive damages because none of the Defendants engaged in oppressive, fraudulent or malicious conduct toward Plaintiffs, and Plaintiffs have failed to allege any misconduct warranting the imposition of punitive damages.

**TWENTY-THIRD AFFIRMATIVE DEFENSE**

**(No Conduct By Corporate Defendants' Managerial Employees)**

23. Defendants Kiki, WB and WBE cannot be held liable for punitive damages because neither Kiki, WB nor WBE, nor any of their officers, directors or managing agents committed any oppressive, fraudulent or malicious act, authorized or ratified such an act, or had advance knowledge of the unfitness, if any, of the employee(s) who allegedly committed such an act, or employed any such employee or employees with a conscious disregard of the rights or safety of others. Plaintiffs have also failed to allege any misconduct by the corporate defendants' managerial employees that would justify the imposition of punitive damages.

**TWENTY-FOURTH AFFIRMATIVE DEFENSE**

**(Intervening/Superseding Cause)**

24. The Complaint, and each cause of action and claim for relief alleged therein, is barred, in whole or in part, on the ground that Plaintiffs' alleged injuries and damages were proximately caused by or contributed to by the acts of other third parties and/or other entities or persons, and said acts were an intervening and superseding cause of the injuries and damage, if any, of which Plaintiffs complain.

**TWENTY-FIFTH AFFIRMATIVE DEFENSE**

**(Justification)**

25. The Complaint, and each cause of action and claim for relief alleged therein, is barred on the ground that the conduct of Defendants in regard to the matters alleged in the Complaint was justified.

**TWENTY-SIXTH AFFIRMATIVE DEFENSE**

**(Reduction of Damages)**

26. Any damage, loss or liability sustained by Plaintiffs must be reduced, diminished, or eliminated in proportion to the wrongful conduct of Plaintiffs.

**TWENTY-SEVENTH AFFIRMATIVE DEFENSE**

**(Mistake of Fact)**

27. The Complaint, and the causes of action and claims for relief asserted therein, is barred in whole or in part, due to a mistake of fact.

**TWENTY-EIGHTH AFFIRMATIVE DEFENSE**

**(Invalid Attempt to Modify Written Contract)**

28. The Complaint, and the causes of action and claims for relief asserted therein, is barred in whole or in part, because the alleged oral agreement is an improper attempt to modify the parties' written agreement.

**TWENTY-NINTH AFFIRMATIVE DEFENSE**

**(Additional Defenses)**

29. Due to the lack of information as to matters set forth in the Complaint, Defendants have insufficient knowledge or information on which to form a belief as to whether they have additional, as yet unstated, affirmative defenses available, and Defendants therefore reserve the right to assert additional affirmative defenses in the event that discovery indicates they are proper.

**CROSS-COMPLAINT**

For its cross-complaint against Cross-Defendants Blair and Heger, Cross-Complainant Kiki alleges as follows:

///

## Nature of the Case

1. This action arises out of Cross-Defendants' failure to fulfill their contractual obligations to provide certain aircraft and aircraft components suitable for filming in the major motion picture, "Sully," starring Tom Hanks. The film is based on the story of Captain Chesley B. Sullenberger ("Captain Sully"), the pilot who, on January 15, 2009, managed to safely land US Airways Flight 1549 on the Hudson River after bird strikes caused both engines of the plane to fail.

2. Based on Heger's representations that Blair would handle everything related to the necessary aircraft from "cradle to grave," Kiki entered into an agreement with Blair, in which Blair promised to deliver two A320 Airbus aircraft that would be "visually complete" and "as similar as reasonably possible to the Airbus A320-200" that Captain Sully had operated. However, the aircraft that Blair ultimately delivered were far from "visually complete," and required hundreds of additional hours of work by Kiki as well as the procurement of hundreds of thousands of dollars-worth of aircraft components, fixtures and furnishings, before the aircraft could be used for filming. As a result of Blair's failure to deliver the aircraft it promised to provide, Kiki incurred damages in excess of $410,000 to render the aircraft film-ready.

## The Parties

3. Kiki is a motion picture production company and California corporation with an office located in Burbank, California. Among the pictures it has produced are "Where the Wild Things Are," "Blended" and the forthcoming theatrical release "The Accountant."

4. Kiki is informed and believes, and based thereon alleges, that Cross-Defendant Blair is, and at all relevant times was, a privately held family company incorporated in the State of California.

5. Kiki is informed and believes, and based thereon alleges, that Cross-Defendant Heger is, and at all relevant times was, an individual residing in California. Cross-Complainant is further informed and believes, and based thereon alleges, that Heger is the President and/or owner of Blair.

6. Kiki is informed and believes, and based thereon alleges, that at all times

mentioned herein, each of the Cross-Defendants was the co-conspirator, alter ego, agent, employee, licensee, guarantee, guarantor, invitee, assignee or successor of the other, and in doing the things hereinafter mentioned, was acting within the course and scope of such conspiracy, agency, employment, guaranty, assignment, license, invitation and/or relationship.

7. Kiki is informed and believes, and based thereon alleges, that at all relevant times, there existed a unity of interest and ownership between Blair and Heger, and that Blair was a conduit through which Heger carried on his personal business, exercising complete control and dominance over Blair and its officers, as well as the business, property and affairs of Blair, to such an extent that any individuality and separateness between them have ceased, and that Heger and Blair are alter egos of each other. It would sanction a fraud or promote injustice to uphold the corporate entity and allow Heger to escape personal liability for what should be deemed his actions and debts.

**Jurisdiction and Venue**

8. Jurisdiction in this Court is proper pursuant to Section 410.10 of the California Code of Civil Procedure. The Court's exercise of jurisdiction over Cross-Defendants Blair and Heger does not offend "traditional notions of fair play and substantial justice" under the Fourteenth Amendment of the U.S. Constitution. *See Int'l Shoe v. Wash.*, 326 U.S. 310, 316 (1945); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985).

9. Venue is appropriate pursuant to Section 395 of the California Code of Civil Procedure because the Defendants are residents of Los Angeles County and the parties' contractual obligations were to be performed in Los Angeles County.

**General Allegations**

10. On or around October 2, 2015, Kiki and Blair entered into an Airbus A320 Acquisition, Transport, Assembly, and Disposal agreement (the "Agreement"), in which Blair agreed to supply Kiki with two (2) A320 aircraft for use in the filming of the major motion picture "Sully." These aircraft were critical to the film, as they were the centerpiece for the scenes capturing and conveying what occurred during US Airways Flight 1549.

11. In exchange for supplying these aircraft, Blair agreed to receive a "fixed price" in

the amount of $1,250,000. Kiki had a budget of only $1 million for the planes, but agreed to pay $1,250,000 based on Blair's representation that the additional $250,000 would cover "everything" and allow Blair to be a "one-stop shop" for Kiki. Indeed, in a June 19, 2015 email from Heger to Tom Moore, Heger "guarantee[d] all costs involved for one price, without overruns" and represented that he would handle everything from "cradle to grave."

12. In the Agreement itself, Blair boasted that it "has been in the business of adding that extra visual element to hundreds of feature films, television shows and commercials. . . . Having worked with many Malpaso Productions features in the past, we understand the goals: short, efficient shooting schedules, and finishing production on time and on budget." A true and correct copy of the Agreement is attached hereto as Exhibit A.

13. The first A320 aircraft is referred to in the Agreement as "FULL A320 SET#1." The Agreement's definition of "'Visually Complete'/ 'SET #1 A320'" states: "Does not include engine outlet, flight deck components, emergency slides, life vest but does include cabin full interior". The first A320 aircraft shall be referred to hereinafter as "A320 No. 1."

14. The second A320 aircraft is referred to in the Agreement as "A320 SET#2," which would "include[] a cut rear and front section including a flight deck." The Agreement's definition of "A320 SET #2" states: "An A320 that will not be placed in the water, and has a visually complete flight deck, galley, passenger compartment, doors. Does not include slides or life vest." The second A320 aircraft shall be referred to hereinafter as "A320 No. 2."

15. In the "Scope of Work" section of the Agreement, Blair agreed that "[t]he overall goal of the project is to provide a realistic full sized visually complete set element that is as similar as reasonably possible to the Airbus A320-200 that operated flight 1549."

16. Consistent with that "overall goal," with respect to the A320 No. 1, Blair agreed to:

1. Procure, dissemble, transport, reassemble, and dispose of 1 "visually complete" (minus landing gear and engine components or flight deck components) FULL A320 SET#1, delivered to Falls Lake at Universal Studios

. . .

b. Transport

i. Provide all transport (approx. 6 truckloads, all oversized) including permitting and police escorts for oversized loads

17. With respect to the A320 No. 2, Blair agreed to:

2. Procure, disassemble, transport, and dispose of 1 A320, minus wings and tail delivered to Falls Lake

a. Obtain aircraft suitable for interior shots with full cabin, overhead bins, seats, galleys and doors to match above airframe

i. This aircraft will have a flight deck with rented instrumentation in place. Best efforts will be made to be able to power on screens, switches and gauges and lights, though nothing will be truly functional. In other words, it will be good enough for incidental flight deck shots, but not flight accurate, and not all components are guaranteed to be functional.

18. When Kiki initially inspected the aircraft prior to delivery, it was observed that many necessary components were missing. In response to Kiki's concerns, Heger provided repeated assurances that the aircraft would be "visually complete" and fully equipped pursuant to the Agreement's requirements. When Blair finally delivered the two aircraft, however, neither was ready to be used for filming.

19. The A320 No. 1 was far from "visually complete" when it was delivered and required significant more work before it could be used for filming. Indeed, the aircraft did not include a "cabin full interior" as many components were missing. The A320 No. 2 was likewise incomplete and far from ready for filming purposes. Despite Blair's agreement to provide an aircraft with a "visually complete flight deck" that would include "rented instrumentation in place," the delivered aircraft was nearly empty, and was not an "aircraft suitable for interior shots" or "good enough for incidental flight deck shots[.]" Blair had also incorrectly installed avionic components from a Boeing 737 and not from an A320 Airbus, *i.e.*, the avionics in the plane that Blair had delivered were not reflective of the actual plane that Captain Sully had flown.

20. Despite Heger's continued representations that the missing parts were on their way, Blair failed to deliver the missing components. Due to Cross-Defendants' failure to provide the aircraft they promised to deliver, Kiki personnel expended hundreds of hours working with outside vendors and American Airlines in order to locate and install hundreds of missing components for the cabin, flight deck and galley. Kiki's own employees, at Kiki's expense, were forced to perform the work that Blair had agreed to undertake in an effort to avoid falling behind schedule due to Blair's failure to deliver the promised aircraft.

21. In addition to its failure to provide "visually complete" aircraft, Blair breached its obligations with respect to the transportation of the aircraft. Specifically, Blair (i) was unable to transport the aircraft to Falls Lake on its own, forcing the involvement of the Defendants; (ii) failed to deliver the necessary permits as promised, forcing Blair to seek the assistance of the Defendants in acquiring the requisite permits; and (iii) failed to provide the security it promised to supply when transporting the aircraft, forcing Kiki to incur additional costs to pay for the necessary security.

22. As a result of Cross-Defendants' failure to breaches of the Agreement, Kiki was ultimately forced to incur additional direct costs in excess of $410,000, not including the costs associated with hundreds of hours in additional personnel time that were expended.

## FIRST CAUSE OF ACTION

**(Breach of Contract)**

23. Kiki incorporates by reference the allegations contained in Paragraphs 1 through 22, as though set forth fully herein.

24. For good and valuable consideration, Kiki entered into the Agreement with Blair. The Agreement is a valid and binding contract between the parties.

25. Kiki has fully performed and complied with its obligations under the Agreement or is excused from performing all of its obligations under the Agreement.

26. Cross-Defendants materially breached their obligations under the Agreement by, *inter alia*, failing to: (i) deliver the "visually complete" A320 No. 1, which should have, but did not, include a "cabin full interior"; (ii) deliver the A320 No. 2 with the requisite "visually

complete flight deck, galley, passenger compartment," that was "suitable for interior shots with full cabin, overhead bins, seats, galleys and doors to match above airframe," including "a flight deck with rented instrumentation in place"; and (iii) procure the necessary permits and security for the transportation of the aircraft.

27. As a direct and proximate result of Cross-Defendants' breach of the Agreement, Kiki has suffered general and consequential damages in an amount in excess of the jurisdictional minimum of this Court to be proved at or before trial, but in no event, no less than $410,000.

**PRAYER FOR RELIEF**

WHEREFORE, Defendants and Cross-Complainants pray for a judgment in their favor on the Complaint and Cross-Complaint, as follows:

1. That Plaintiffs take nothing by way of the Complaint on file herein;

2. Judgment be entered in favor of Defendants, and in favor of Cross-Complainant Kiki in an amount to be determined by proof at trial, but in no event no less than $410,000;

3. For Defendants' and Cross-Complainant's costs of suit incurred herein; and

4. For such other and further relief as the Court may deem just and proper.

DATED: September 30, 2016

KELLEY DRYE & WARREN LLP
Michael J. O'Connor
David E. Jang

By: [signature]
Michael J. O'Connor

*Attorneys for Defendants Kiki Tree Pictures, Inc., WB Studio Enterprises Inc. d/b/a Warner Bros. Pictures, Warner Bros. Entertainment Inc. and Tim Moore*

## DEMAND FOR JURY TRIAL

Cross-Complainant Kiki Tree Pictures, Inc. hereby demands a trial by jury on all claims.

DATED: September 30, 2016

KELLEY DRYE & WARREN LLP
Michael J. O'Connor
David E. Jang

By: [signature]
Michael J. O'Connor

*Attorneys for Defendants Kiki Tree Pictures, Inc., WB Studio Enterprises Inc. d/b/a Warner Bros. Pictures, Warner Bros. Entertainment Inc. and Tim Moore*

# EXHIBIT A

blair adhesives
11034 Lockport Place Santa Fe Springs, CA 90670
562.946.6004 www.blairadhesives.com

# Airbus A320 Acquisition, Transport, Assembly, and Disposal

Prepared For:
"UNTITLED SULLY PROJECT"
KIKI TREE PICTURES Inc.
4000 Warner Blvd Building 81
Burbank, CA 91522

Prepared by:
Blair Adhesive Products, Inc.
11034 Lockport Place
Santa Fe Springs, CA 90670
562.946.6004
www.blairadhesives.com
Contact: Scott Heger,
scott@blairadhesives.com

Blair Adhesive Products, Inc. (hereinafter referred to as "BLAIR") is pleased to submit this agreement to KIKI TREE Pictures Inc. (hereinafter referred to as "KIKI TREE") for the procurement, disassembly, transport, reassembly, and disposal of multiple airframes and various components to multiple locations described in greater detail below.

By the signature of KIKI TREE authorized representative set forth below, KIKI TREE agrees to be bound by the representations made herein.

This document and the agreed pricing provided herein, shall remain valid for the length of this production. This is a "fixed price" agreement. Any changes require written agreement, via purchase order, between the parties involved.

Aircraft registration #s **N106CE** and **N206WB** have been reserved at this time.

blair adhesives
11034 Lockport Place Santa Fe Springs, CA 90670
562.946.6004 www.blairadhesives.com

I. Introduction

KIKI TREE needs to acquire multiple A320 airframes and components, to facilitate the production of "UNTITLED SULLY PROJECT", recounting the events of Captain Sullenberger on US Airways Flight 1549, in an incident that became known as "Miracle on the Hudson". A bird strike on takeoff caused both engines to fail, and a successful unpowered emergency landing was performed on the Hudson River, in which all 155 occupants survived and successfully evacuated. To facilitate the filming of reenacting these events, Falls Lake has been selected as one filming location, due to its appropriate size, facilities and availablity. Falls Lake can accommodate a fully assembled Airbus A320-200, and when filled with water, should provide an ideal stand in location for filming (see fig. 1). This does present a logistical challenge of moving a visually complete large aircraft from its current out of state location, requiring disassembly, specialized transport and reassembly, referred to hereafter as "FULL A320 SET#1 ". To facilitate filming and decrease shooting days, a second airframe and interior will be transported to Falls Lake for interior aircraft shots (see fig. 2), and will be referred to hereafter as "A320 SET#2" , which includes a cut rear and front section including a flight deck.

To expand and restate KIKI TREE has provided a general specification and has communicated a set of requirements as follows:

1. Delivery and later removal of a visually complete exterior above wing level, FULL A320 SET #1(NO LANDING GEAR or ENGINES) in the vicinity of Falls Lake , Universal City, California
2. Delivery and later removal of a second A320 with wings and tail portion removed from the aircraft, also in the vicinity of Falls Lake used for concurrent shooting/ interior and flight deck shots
3. Delivery to Falls Lake and later removal of 1 center cut fuselage 3 seat wide section for shipping to New York City (on production company truck) for on location shots, if requested by production prior to fuselage cuts.

II. About Blair Adhesives

For over 30 years BLAIR has been in the business of adding that extra visual element to hundreds of feature films, televisions shows and commercials. It can safely be assumed that any blood, mud, oil, alien slime, and countless other liquid effects elements on film were created by BLAIR, from quantities ranging from 5 gallons to multiple tanker trucks. A recent example includes the more than 2,000 gallons of simulated mud for "American Sniper", as well as aircraft propellers and gearboxes for fan units. BLAIR has also been involved with supplying and brokering large scale visual elements used in "Flags of Our Fathers" including set dressing elements as well as pyrotechnic raw materials. Having worked with many Malpaso Productions features in the past, we understand the goals; short, efficient shooting schedules, and finishing production on time and on budget. BLAIR is committed to fast, effective solutions utilizing our proven team to deliver the required results as quickly, safely, and cost effectively as possible.

III. Scope of Work

To put it simply, this is a large logistical project involving that contains many thousands of individual figurative and literal moving parts. The overall goal of the project is to provide a realistic full sized visually complete set element that is as similar as reasonably possible to the Airbus A320-200 that operated flight 1549. BLAIR ADHESIVES will provide as noted:

1. Procure, disassemble, transport, reassemble, and dispose of 1 "visually complete" (minus landing gear and engine components or flight deck components) FULL A320 SET#1, delivered to Falls Lake at Universal Studios
   a. Procurement and Disassembly
      i. Aircraft is to be purchased by Blair Adhesives, and meticulously disassembled
      ii. Remove hazardous materials from aircraft
      iii. Remove or plug hydraulic systems that will be in contact with water
      iv. Drain and flush fuel tanks and remove lavatories (both airframes)
   b. Transport
      i. Provide all transport (approx. 6 truckloads, all oversized) including permitting and police escorts for oversized loads
         1. Note: 30 day lead time and 7 day travel window for CALTRANS permit
      ii. Arrange truck access and physical clearances for negotiating within Universal Studios
      iii. Coordinate crane/ truck unloading and provide equipment rentals for reassembly.
   c. Reassembly
      i. Provide and manage aircraft mechanics for reassembly with a 2 -3 week estimate.
      ii. Obtain and provide wiring diagrams for internal lighting/ systems
      iii. Build leg stands to match SPFX gimbal requirements to support completed aircraft (extra cost)

blair adhesives
11034 Lockport Place Santa Fe Springs, CA 90670
562.946.6004 www.blairadhesives.com

d. Weight and Balance
   i. Obtain weight and balance calculations from AIRBUS
   ii. Obtain airframe weight part estimates for trucking parts
   iii. Complete daily weight and balance estimates and ballast requirements on filming days
   iv. Obtain water ballast tanks to maintain weight equalization (dry calculations)
   v. Provide SPFX all necessary engineering information from AIRBUS
e. Disposal
   i. Provide labor to disassemble and properly recycle airframe –approx. 1 week
   ii. Provide transport for all disposal
   iii. Production company has the option of keeping aircraft, or any part thereof, except rental parts (namely cabin avionics, radome, and slats)

2. Procure, disassemble, transport, and dispose of 1 A320, minus wings and tail delivered to Falls Lake
   a. Obtain aircraft suitable for interior shots with full cabin, overhead bins, seats, galleys and doors to match above airframe
      i. This aircraft will have a flight deck with rented instrumentation in place. Best efforts will be made to be able to power on screens, switches and gauges and lights, though nothing will be truly functional. In other words, it will be good enough for incidental flight deck shots, but not flight accurate, and not all components are guaranteed to be functional.
   b. This aircraft will be cut to remove wings and tail for transportation purposes, and will only be intact from flight deck to rear doors (figure 3)
   c. Dispose of aircraft at the end of production
   d. Provide SPFX/ construction cutting instructions of sidewalls and roof
3. Procure, transport from Falls lake area, one A320 3 seat wide center fuselage piece for New York (if needed), and one piece of 7.5 foot wide fuselage section to Atlanta,Ga at Blair Adhesives expense.

IV. Timeline

| Day | |
|---|---|
| June 29 | Purchase and begin process to obtain clear titles to aircraft |
| August 3 | Aircraft titles transfer in process and final sales documents pending. Begin permitting process for transport. –10% Payment Due |
| August 3-29 | BLAIR start obtaining extra parts as needed |
| August 17 | Aircraft disassembly and prep continues –10% Payment Due |
| August 17 | Progress photos sent to production |
| August 24 | Progress photos sent to production |
| August 31 | Progress photos sent to production |
| Sept 1 | Fuselage section for NYC to be cut , and ready to go |
| Sept 3 | Fuselage in AZ and Victorville ready to go |
| Sept 7-14 | Aircraft arrives in approx. 9 trucks incl. special transport |
| Sept 8-25 (approx.) | Assembled FULL A320 #1 and A320 CUT #2 ready on parking lot adjacent to Falls Lake --80% final Payments Due. Payment per aircraft shall be paid at each completion promptly. |
| Last Film Day +2 Weeks | Disassembly, recycling, and proper disposal. |

V. General Terms and Conditions

1. BLAIR will require most if not all of the Falls Lake adjacent parking lot during the assembly period. (see figure 10)

2. BLAIR will not be responsible for any costs or schedule impacts associated with rectifying any issues or events beyond the reasonable control of BLAIR and its subcontractors, which prevent or otherwise inhibit completion of the project and do not fall within the general scope of work. The parties much agree in writing on the costs associated with any unplanned changes. Examples include but are in no way limited to cancellation of the production, change in production location, changes in production schedule, failure to obtain government required permits, etc,

blair adhesives
11034 Lockport Place Santa Fe Springs, CA 90670
562.946.6004 www.blairadhesives.com

3. Additional movement of aircraft components not covered in the Scope of Work can be arranged with BLAIR for an extra cost with an agreed upon written change order.

4. Flight deck components such as avionics, gauges and screens in the A320 UPPER component are considered rental parts that must be returned.

5. All components within A320 N106CE (SET#1) are unconditionally released to use as KIKI TREE sees fit, included but not limited to flooding with water, painting, general destruction on the FULL A320.

6. FULL A320 #1 does **not** include flight deck instrumentations, screens, avionics, engines components or landing gear.

7. Full U.S. Airways livery is mostly but not fully complete on current aircraft. It will require U.S Airways logo on the side of the aircraft, and tail. See figure 8 for more details. Painting not covered by BLAIR.

VI. Assumptions

1. All obligations of KIKI TREE described herein will be carried out in a timely manner, including the obligation to make timely payment in accordance with the payment terms and schedule provided herein.

2. Mutually acceptable terms and conditions will be negotiated between BLAIR and KIKI TREE and will supplement the terms and conditions contained herein

3. BLAIR will provide prompt feedback/ answers on any questions KIKI TREE may have and be reasonably available to respond

4. BLAIR employees, mechanics and crane equipment will be provided access to Universal lot/ Falls Lake as reasonably required to perform the work during the schedule set forth above. This also extends to BLAIR's subcontractors, and the substantial rental equipment used to reassembling the aircraft. During reassembly, production employees will only have limited escorted access to SET# 1 until completed.

VII. Definitions

1. **"Visually Complete"/ "SET #1 A320"** – Does not include engine outlet, flight deck components, emergency slides, life vest but does include cabin full interior.
2. **"A320 SET #2"** (see Fig. 3)- An A320 that will not be placed in the water, and has a visually complete flight deck, galley, passenger compartment, doors. Does not include slides or life vest.
3. **Falls Lake** – Back lot filming location of Universal Studios
4. **SPFX-** The special effects department that will be moving, manipulating, and otherwise managing the aircraft after final inspection and reassembly
5. **Cockpit Avionics**—Any electrical component beyond the front passenger doors including the flight deck area

**OWNERSHIP**
Ownership, title and liability responsibility will pass to production Company, upon reassembly and acceptance. An FAA Bill of Sale and Titling if required will be competed at no additional cost to location of your choosing. Aircraft delivered to Georgia will Title in that State handled by Georgia aircraft dealer (no cost). The attached Liability release shall become part of this agreement for each airframe, no matter what State or business entity becomes the final SELLER of record. Since all production locations are yet to be determined, any additional cross-country movements of airframe parts to be at exact cost only, or by production company transportation. KIKI TREE has the option to keep intact SET #1 and SET #2, minus every flight deck component, KIKI TREE must give 30 days written notice prior to end of active production. If KIKI TREE keeps either or both airframes, this relieves BLAIR from the disposal, and labor to do so, including any time in the future. PRICE for all of the above work for both airframes, and center fuselage piece (if needed) is **$1,250,000.**

[signature] 10/2/15 [signature] 8-15
KIKI TREE PICTURES INC DATE BLAIR ADHESIVES PRODUCTS INC



Exh. 20
110

blair adhesives
11034 Lockport Place Santa Fe Springs, CA 90670
562.946.6004 www.blairadhesives.com

Figure 1:



Figure 2:



Figure 3:




5

blair adhesives
11034 Lockport Place Santa Fe Springs, CA 90670
562.946.6004 www.blairadhesives.com

Figure 9:



Figure 10:



**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and **not a party to this action**. I am employed in the County of Los Angeles, State of California. My business address is 10100 Santa Monica Boulevard, Twenty-Third Floor, Los Angeles, California 90067.

On September 30, 2016, I served a true copy of the foregoing document described as **DEFENDANTS' ANSWER TO PLAINTIFFS' UNVERIFIED COMPLAINT AND CROSS-COMPLAINT OF KIKI TREE PICTURES, INC.; JURY TRIAL DEMANDED** on the interested parties in this action as follows:

Aaron Shechet, Esq.
Leigh Chandler, Esq.
CHANDLER & SHECHET, LLP
P.O. Box 7244
Beverly Hills, CA 90212
Counsel@SolutionsLLP.com
aaron.shechet@gmail.com
(310) 339-1354 • Fax: (310) 558-1519

☒ **BY MAIL:** I enclosed the document in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with Kelley Drye & Warren LLP's practice for collecting and processing correspondence for mailing. On the same day that the correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

☒ **BY E-MAIL:** I caused a copy of the document(s) to be sent from e-mail address ktjaden@kelleydrye.com to the persons at the e-mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

☒ **STATE:** I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on September 30, 2016, at Los Angeles, California.

[signature]
Karen M. Tjaden